STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

-------------------------------------------------------------------

ANGELA VELASCO, individually and
on behalf of all others similarly situated,

                    Plaintiff,

          -vs-                    CASE NO.:  08-C-0244

SOGRO, INC.,
d/b/a Budget Host Diplomat Motel,

                    Defendant.

-------------------------------------------------------------------

                    VOLUME 2

          TRIAL hearing in the above-entitled matter, held

before the Honorable Charles N. Clevert, Jr., on the 24th day

of February, 2015, commencing at 8:43 a.m. and concluding at

4:38 p.m.


A P P E A R A N C E S

The Consumer Advocacy Center, PC
Mr. Lance A. Raphael and Ms. Allison A. Krumhorn
180 West Washington Street, Suite 700
Chicago, Illinois  60602
Appeared on behalf of the Plaintiffs.

Tressler, LLP
Mr. James K. Borcia
233 South Wacker Drive, 22nd Floor
Chicago, Illinois  60606-6308
Appeared on behalf of the Defendant, also present.


Ms. Kristine Wilson Brah, Clerk.
Ms. Sheryl L. Stawski, RPR, Official Reporter.

* * * *

I N D E X

PAGE

WITNESS:  ANGELA VELASCO

Direct Examination by Mr. Raphael                    51
Cross-Examination by Mr. Borcia                      56
Redirect Examination by Mr. Raphael                  62


WITNESS:  ROBERT LEE BOEHM (via video conference)

Examination by Mr. Borcia (outside of jury trial)   66


Direct Examination by Mr. Raphael                    88
Continued Direct Examination by Ms. Krumhorn         109
Cross Examination by Mr. Borcia                      122
Redirect Examination by Ms. Krumhorn                 135

WITNESS:  TRISHA PUGAL

Direct Examination by Mr. Raphael                    138
Cross-Examination by Mr. Borcia                      152
Redirect Examination by Mr. Raphael                  162
Recross-Examination by Mr. Borcia                    167

1           T R A N S C R I P T   O F   P R O C E E D I N G S

2               THE COURT:  Yesterday after the jury was excused, the

3    reporter left, and the courtroom deputy stepped out, the Court

4    conducted further proceedings off the record with the idea that

5    the discussions between the Court and counsel would be put on

6    the record this morning.

7               We talked about multiple exhibits that the plaintiff

8    wishes to have admitted as well as the possibility of the

9    plaintiff offering testimony through one of the plaintiff's law

10   firm's paralegals.

11              The defense expressed its opposition to most of the

12   exhibits that the plaintiffs wish to present.  The exhibits

13   that were the primary focus of the discussions were Exhibits 1,

14   3, 14, 15, 21, 22, 23, 24 and 26.

15              The defense stated multiple objections to Exhibit

16   No. 1.  They are summarized as follows:  A lack of foundation

17   or insufficient foundation; relevance; they're cumulative; and

18   they contain sensitive personal information which should not be

19   disclosed and made part of the record.

20              The Court indicated preliminarily that Exhibit 1 would

21   be received over the defendant's objections and noted several

22   things, particularly, any sensitive personal information may be

23   sealed or redacted.

24              The exhibits do not necessarily include cumulative

25   evidence; and even if the evidence is cumulative at this stage,

1    it does not appear that that would preclude receipt of the

2    exhibit.

3            More importantly, the plaintiff -- plaintiffs

4    indicated that they can establish the proper foundation for

5    these exhibits; and the Court, based upon the representations

6    of plaintiff's counsel, is satisfied that the exhibits do

7    provide proof on matters that are significant and relevant in

8    this case.

9            With regard to Exhibit 3, the plaintiffs indicated

10   that they would like to highlight and focus on Pages 2431,

11   2432, 2433, 2438, 2442, 2443, 2444, 2448, 2449, 2452, 2453 and

12   2454.

13           The Court after hearing the arguments preliminarily

14   indicated it is inclined to receive over the defendant's

15   objection Exhibit No. 3, and particularly, materials just

16   referenced.

17           With regard to Exhibit 14, which includes an

18   affidavit, the plaintiff -- plaintiffs indicated that they are

19   not seeking to have the affidavit admitted but, instead, will

20   seek to have the balance of the exhibit received, particularly

21   after the testimony of another witness who will appear as a

22   custodial of records.  Preliminarily, it would appear that

23   Exhibit 14 as truncated would be admissible over the

24   defendant's objection.

25           I do not have itemized notes with respect to exhibits

1    21 through -- 21, 22, 23, 24 and 26; and so we'll have to touch

2    on those again.

3         Now, with regard to a summary exhibit, based upon

4    Exhibit No. 1, there was discussion as to whether or not the

5    defendant's paralegal or one of the -- I'm sorry -- one of the

6    plaintiff's paralegals should be allowed to testify with

7    respect to the result of the plaintiff's review of Exhibit

8    No. 1.  The defense expressed an objection, first of all, to

9    the use of the summary; and, secondly, to the testimony of the

10   paralegal.

11        The plaintiffs did not identify the particular

12   paralegal who will be available to testify, but one was named

13   Alexis; the other Kimberly.

14        Preliminarily, the Court indicated that not

15   withstanding the failure of the plaintiffs to disclose the

16   identities of these paralegals, the plaintiffs would be allowed

17   to testify with respect to their analysis of Exhibit No. 1.

18        The Court notes that Exhibit No. 1 is represented to

19   be documents that were produced by the defendant in response to

20   the plaintiff's request for the production of documents; and

21   that the exhibit is a substantial stack of materials which

22   appear to be at least 15 to 18 inches tall.

23        These materials are no surprise to the defendant, and

24   the defendant was certainly able to evaluate its own materials

25   and does not, in the Court's view, have a valid reason why it

1    could not analyze the same documents.

2         Nevertheless, the Court has further indicated that if

3    the plaintiffs wish to call the paralegal, in fairness to the

4    defense, the Court will provide the defense with an opportunity

5    to examine the paralegal on the record in the courtroom out of

6    the -- outside the presence of the jury before any testimony is

7    offered in front of the jury by the testifying paralegal.

8         I turn next to plaintiff's counsel to inquire whether

9    or not the Court has accurately recapped our discussions; and

10   if not, the plaintiff's counsel is invited to correct anything

11   that may not have been precisely stated and to supplement the

12   Court's comments respecting the plaintiff's proposed evidence

13   and the discussions that took place yesterday evening until

14   approximately eight o'clock.

15        MR. RAPHAEL:  Thank you, Your Honor.

16        I'll go down them numerically with regard to Exhibit 1

17   first.

18        Your Honor correctly summarized the defendant's

19   objections in terms of foundation, relevance, an issue as to

20   the sensitive information and cumulativeness.

21        With regard to the lack of foundation, Your Honor was

22   cited by plaintiff's counsel; the fact that -- a Seventh

23   Circuit case, *U.S. versus Brown,* which is 688 F.2d, 1112, said

24   the lower court found that once a defendant voluntarily

25   produces documents and implicitly represents them to be

subpoenaed corporate records cannot be heard to contend they are not so.

And this would satisfy the foundation requirement for authentication of records being produced by the defendant. The idea of establishing a foundation beyond their authenticity doesn't exist when you're looking to merely introduce the documents that, in essence, speak for themselves.

The *South Central Bank versus Citicorp*, we also cited, Northern District of Illinois case of -- 863 F. Supp. 635 -- we are bound to follow the Seventh Circuit's explicit holding that production of a document amounts to an implicit authentication of a document and disagree that the authentication of a document requires proof of who the author is and that the document was sent or received.

In this case even further we know who the author is because Mr. Solus testified that he was the one who was primarily responsible for filling out the registration -- the registration cards and taking credit card receipts, so --

THE COURT: I don't think it's really necessary for you to recap all of the citations at this time.

Let's just look at the overarching matters so that we can at least determine whether or not Exhibit 1 is as described and whether or not your views have been expressed correctly.

MR. RAPHAEL: Yes. And moreover, Your Honor noted that this document was a document that was produced

1    specifically by the defendant in the course of discovery, and

2    we tendered to Your Honor a copy of the cover letter that --

3    that accompanied the production from the defendant's office.

4         I note further that in terms of our re-tender of

5    Exhibit 1 to defendant, in other words when we organized it,

6    I've just looked at the metadata for the file itself.  It was

7    started -- It was started on February 18th and was not finished

8    until February 20th at 3:26 p.m.; and that's looking at the

9    actual metadata of the -- of the computerized document that we

10   sent the defendant.  So it was timely produced as soon as it

11   was done.

12        In terms of the argument about sensitive nature of the

13   information, we have a protective order --

14        THE COURT:  Again --

15        MR. RAPHAEL:  Okay.

16        THE COURT:  Again, with regard to Exhibit 1 is there

17   anything that the Court stated that --

18        MR. RAPHAEL:  No, Your Honor.

19        THE COURT:  -- is incorrect?

20        MR. RAPHAEL:  No, Your Honor.

21        THE COURT:  Are you still seeking to have the Court

22   admit Exhibit 3 as described in the Court's recap?

23        MR. RAPHAEL:  Yes, Your Honor.

24        THE COURT:  And is there anything regarding Exhibit 3

25   that you believe should be corrected?

1          MR. RAPHAEL:  No, Your Honor.

2          THE COURT:  All right.  Are you still seeking to have

3     admitted Exhibit 14?

4          MR. RAPHAEL:  Yes, as truncated not having the

5     affidavit, right.

6          THE COURT:  That affidavit is the affidavit of a

7     Mr. Wong?

8          MR. RAPHAEL:  Correct.

9          THE COURT:  And what about 15, pages 2565 through

10    2605?

11         MR. RAPHAEL:  Oh, yes.  Yes.

12         THE COURT:  Can you just quickly indicate for the

13    record what that particular exhibit and those pages reflect.

14         MR. RAPHAEL:  Yeah.  Exhibit 15, those pages reflect

15    statements from Paymentech to Sogro, Inc. during a period that

16    starts around May 2005 through December 2007.  And it is just

17    the first page of the statements where there would be contained

18    notifications to Sogro, Inc. to take note of various items of

19    input, I guess, and in this case, security features, references

20    to go to the website, references to check on updated software,

21    and so forth, which is relevant to our argument that his

22    violation of the statute was reckless, in part, due to his

23    ignoring these types of notifications.

24         THE COURT:  All right.  And Exhibits 21, 22, 23, 24,

25    and 26, are you still seeking to have those admitted?

1     MR. RAPHAEL:  Yes, Your Honor.  Twenty-one, 22, 23 I

2     can put together in one category.  These are published

3     documents or published books that come out every year from --

4     from Visa.

5     For example, in 20 and under Rule 803.17, these types

6     of documents would be able to be admitted as an exception to

7     the hearsay rule because they're commercial publications

8     generally used and relied upon by the public or, in this

9     instance, persons in particular occupations.

10    The Visa rules for merchant services attached as 20

11    and -- I'm sorry -- oh, as 21 and 22, those are each the

12    relevant years of these thick manuals.  And as the Court can

13    see --

14    THE COURT:  Just briefly, what are they?

15    According to the exhibit list, exhibits -- Exhibit 21

16    are the rules for Visa merchants, card acceptance and charge

17    back guidelines 2006.

18    MR. RAPHAEL:  Right.

19    THE COURT:  Twenty-two would be similar rules for

20    2007.

21    Twenty-three would be the Payment Card Industry

22    Standards for January 2005.

23    Twenty-four, declaration of Carrie Back.

24    And 26 would be an affidavit of Trisha Pugal.

25    Is that -- Can you tell me the basis for seeking to

1   have these particular items admitted.

2        MR. RAPHAEL:  Twenty-two, 23 and 24 are the rules and

3   regulations that Sogro agreed to follow under his contract.

4        And those rules for those particular years included

5   the truncation requirements under the FACTA.

6        The declaration of Carrie Back from Discover card

7   identifies as a keeper of records -- well, she authenticates

8   the same type of documents, select portions thereof, of the

9   merchant services agreements for 2002, '04, '06, the operating

10  regulation for years, '02 and '04, and the merchant operating

11  regulation releases on the software from version 7.2, 8.1 and

12  8.2.

13       And those had they been complied with by the

14  defendant, we wouldn't have any violation of FACTA here.

15       THE COURT:  Again, what would be the basis for getting

16  these in?

17       MR. RAPHAEL:  Oh, that these documents were both

18  available to and urged to be viewed by Sogro prior to and

19  during the time period he violated FACTA demonstrating --

20       THE COURT:  Will you offer any witness in support of

21  your request to have these admitted?

22       MR. RAPHAEL:  As to the declaration of Carrie Back,

23  yes.  Carrie Back will come in.

24       THE COURT:  All right.

25       Now, with regard to the other -- Carrie Back will come

1    in, and you will seek to have her declaration admitted for what

2    purpose?

3         MR. RAPHAEL:  No, her -- her documents attached to her

4    declaration for the purposes of showing that the defendant

5    violated FACTA with recklessness.  Discover cards rules when

6    they were modified were modified to comport with FACTA, and

7    under the defendant's contract with Discover to be authorized

8    to take Discover cards, he had to comport with their rules,

9    which would have, therefore, comported with FACTA.

10        THE COURT:  I'm still unclear as to how you will

11   authenticate these particular documents and whether or not

12   there will be a witness who will be tendered for the purpose of

13   getting these particular documents into the record.

14        MR. RAPHAEL:  Yes.  Ms. Back is the Ohio witness who

15   we intend to have produced.

16        THE COURT:  So Ms. Back will be the witness --

17        MR. RAPHAEL:  For Discover.

18        THE COURT:  -- for Discover through whom you will

19   attempt to get these documents in?

20        MR. RAPHAEL:  Yes.

21        THE COURT:  All right.

22        Now, with regard to the summary and the paralegal,

23   have you identified a paralegal through whom you will attempt

24   to get in the summary?

25        MR. RAPHAEL:  Yes.  It's Alexis.

```
 1              THE COURT:  What is the last name?

 2              MR. RAPHAEL:  Raphael.

 3              THE COURT:  And is she available to testify at this

 4   time?

 5              MR. RAPHAEL:  Yes, depending on when you want her to

 6   come in we'll have her take the train in.

 7              THE COURT:  How much time will you need to get her

 8   here?  How much notice?

 9              MR. RAPHAEL:  At most, four hours depending on the

10   train schedule; so if we know --

11              THE COURT:  An Amtrak.

12              MR. RAPHAEL:  Yeah she's going to take an Amtrak.

13   Yes, I know, Your Honor.

14              THE COURT:  That's an iffy situation?

15              MR. RAPHAEL:  They're subsidized by the federal

16   government.  We love Amtrak.

17              THE COURT:  I do, too; but I've been stuck on that

18   train.

19              MR. RAPHAEL:  I know, me too.  I used to come up here

20   all the time.  It comes out of Union Station.  It's about an

21   hour and a half.

22              THE COURT:  All right.

23              MR. RAPHAEL:  We have the schedule.  We can, off the

24   record, figure out when is the best time to squeeze her in.  If

25   the defendant wants to Skype her in, because it's not something
```

1    that's going to occur in front of the jury.

2         THE COURT:  Well, at least as far as her preliminary

3    statements are concerned, I can understand that; but I do

4    believe under the circumstance we cannot use Skype.

5         MR. RAPHAEL:  What about the Court's video

6    conferencing ability just for the preliminary --

7         THE COURT:  For the preliminary examination, we can

8    use video conferencing.

9         MR. RAPHAEL:  Okay, because that might make it so that

10   we can squeeze her in at any point in time.

11        THE COURT:  All right.  If you can get that

12   information to our IT person, we will see whether or not we can

13   do that.  I note that the video machinery has been set up, and

14   I'm curious whether or not it is now ready.

15        Do you have a witness standing by?

16        MR. RIEDIJK:  I'm going to connect right now.

17        THE COURT:  If there's a witness standing by, we will

18   interrupt our discussion of the exhibits.

19        MR. BORCIA:  I have many things to say about what Your

20   Honor said.

21        THE COURT:  Obviously.

22        MR. BORCIA:  So I understand we can take it out of

23   order if you want to, but I disagree with many of the things

24   that counsel has said also about what happened last night.  So

25   we can take that up later.

1          THE COURT:  Absolutely.

2          MR. BORCIA:  And one issue with respect to this

3    witness, which we just went through, Judge, is we did not talk

4    about the sub exhibits for this witness, Exhibit No. 14, last

5    night.

6          We did not go through those different exhibits, and so

7    there's going to be objections to many of these exhibits that

8    Your Honor never went through last night.

9          THE COURT:  All right.  Well, if there are objections

10   that need to be considered and were not discussed last night,

11   we will certainly go through any ongoing objections.  Who is

12   the witness standing by.  Mr. Raphael?

13         MS. KRUMHORN:  There was a snowstorm in Dallas.  They

14   all got kind of held up.  The court reporter is on her way up

15   to the office, so they are there.  I anticipate it will be --

16         MR. RAPHAEL:  Will Your Honor permit her to use her

17   cell phone in the courtroom for the moment?

18         THE COURT:  For that period, yes.

19         MR. RAPHAEL:  Okay.  Are we off the record, Your

20   Honor?

21         THE COURT:  Yes.

22         (Discussion held off the record.)

23         THE COURT:  On the record.  Let's hear from you,

24   Mr. Raphael, regarding Exhibit 14; then I'll go to Mr. Borcia

25   but he has expressed some ongoing objections.

1    MR. RAPHAEL:  So Exhibit 14, for the record, is the

2   affidavit of the keeper of records of Benjamin Wong, which had

3   attached to it ten exhibits, ten documents, and was sworn under

4   penalties of perjury back in 2011 and was submitted to the

5   Court as evidence in document 81-4 and filed with the Court on

6   April 12th, 2011.

7        Document 14 is presently identified here as Bates

8   numbers 2536 through 2564.

9        MR. BORCIA:  Incorrect.

10       MR. RAPHAEL:  What are the numbers that you have?

11       MR. BORCIA:  2534 not 36.

12       MR. RAPHAEL:  I'm sorry.  I misspoke.  He's correct

13  2534 through 2564.

14       THE COURT:  Yes, I have --

15       MR. RAPHAEL:  Okay.

16       THE COURT:  -- Exhibit 14 in front of me.

17       MR. RAPHAEL:  All right.  So presently we are not

18  looking to have admitted the actual affidavit of the keeper of

19  records but rather the records through the use of a

20  subsequently identified keeper of records from Chase Payment,

21  the first document --

22       THE COURT:  That person will be?

23       MR. RAPHAEL:  Allison knows his name.  She stepped out

24  for a second to coordinate with him.  I believe it is Robert

25  Boehm, B-O-E-H-M.  And he, too, is at the same location that

1    Benjamin Wong had been at which is the headquarters of Chase

2    Paymentech in Dallas.  It's at 14221 Dallas Parkway.

3            So he's going to establish the foundation for these

4    records in much the same way as Benjamin Wong did.  And while

5    these records were previously submitted to the Court as

6    evidence during various pleadings, and there were no objections

7    to the form of that affidavit not -- not substantiating --

8            THE COURT:  Generally speaking, what do the records

9    purport to disclose?

10           MR. RAPHAEL:  Well, Exhibit 1 purports to disclose --

11           THE COURT:  You're talking about sub Exhibit 1 within

12   Exhibit 14?

13           MR. RAPHAEL:  Right, sub Exhibit 1.

14           THE COURT:  14-1, we'll refer to it as.

15           MR. RAPHAEL:  Okay, yeah, 14-1.

16           THE COURT:  Mr. Raphael, you've got to move it along.

17   We can't just go at glacial speed.

18           MR. RAPHAEL:  Sorry, Your Honor, I'm just trying to be

19   precise.

20           Exhibit 1 is a March 21st mailed notice that went out

21   to merchants like the defendant advising them of the federal

22   rules having been updated.  The merchant services agreements

23   being updated and giving advice to merchants like Sogro as to

24   how to comply with FACTA.  There's a picture of an example

25   customer receipt.

1          Exhibit 2 is also a March 2004 document mailed to

2    merchants and referencing the update in the federal -- with the

3    federal government Visa and MasterCard rules and other state

4    laws that are meant to inform merchants like Sogro to become

5    compliant with FACTA.

6          Exhibit 3 is a publication that Paymentech puts out,

7    and this one was in September of 2004.  It's mailed to all

8    merchants that are customers of Paymentech, like Sogro,

9    advising them of the new requirements to become compliant with

10   FACTA.

11         Exhibit 4 is a publication -- another publication

12   created in January of 2005 and mailed to merchants who are

13   customers of Paymentech, again, telling them get compliant and

14   giving them phone numbers and other types of information about

15   FACTA for -- including, I guess --

16         THE COURT:  We don't need the excruciating detail.

17   I'm asking for the general descriptions of the documents and

18   why you believe these documents are admissible.

19         MR. RAPHAEL:  Well, these are all various forms of

20   notices, publications of various sorts mailed to merchants,

21   like Sogro, to advise them to become compliant.  And this would

22   tend to --

23         THE COURT:  If they are just mailed to merchants like

24   Sogro, that's not enough.

25         MR. RAPHAEL:  No, I'm sorry.  I'm not saying it

1    correctly.  It's their regular course of -- regular business

2    practice to have sent these --

3          THE COURT:  Are you contending that these are

4    documents prepared in the ordinary course of business of

5    Paymentech maintained by Paymentech and sent to Sogro either

6    directly or made available to Sogro at the times indicated on

7    the documents?

8          MR. RAPHAEL:  Yes.

9          THE COURT:  Get to it.  If that's the case, get to the

10   point.

11         MR. RAPHAEL:  I'm sorry.  That's what all of these

12   documents are.  And they tend to show recklessness as to

13   Sogro's violation.

14         THE COURT:  Regardless of what you think they show, I

15   just want to know the basis for having these -- your proposed

16   basis for having these documents admitted.

17         MR. RAPHAEL:  My proposed basis for having these

18   documents admitted is that the keeper of records will testify

19   that all these documents were made in the regular course of

20   regularly conducted business activity of Paymentech.

21         They were mailed out to their customer merchants,

22   including Sogro, during the regular course of regularly

23   conducted business activity; and then the forms of those

24   documents were stored and saved in a reliable fashion at

25   Paymentech.  And they were produced to us in response to our

1    request from Paymentech to produce these business records.

2              THE COURT:  All right.  Mr. Borcia.

3              MR. BORCIA:  No, we have spent -- This case has gotten

4    way off track.  We spent so much time yesterday on a document

5    related to --

6              THE COURT:  Tell me why these --

7              MR. BORCIA:  I'm getting to that, Judge.

8              THE COURT:  No, I --

9              MR. BORCIA:  I am getting to.

10             THE COURT:  I'm going to cut you off.  I'm cutting you

11   off for this reason.

12             Both of you go off on a tangent before you get to the

13   point.  I don't care about what happened yesterday, generally.

14             I want to know specifically now why you believe these

15   documents are not admissible.

16             MR. BORCIA:  This is not a case of Paymentech versus

17   Sogro.  Paymentech's regulations, Paymentech's rules are not

18   relevant to this case.  The issue --

19             THE COURT:  So you're objecting because they're

20   irrelevant.  What's the next point?

21             MR. BORCIA:  The other objection is, look at the

22   actual affidavit.  Mr. Raphael misrepresented the documents.

23             Exhibit No. 1, the affidavit says, Exhibit No. 1 was

24   mailed to certain merchants.  Does not say it was mailed to

25   Sogro.  Certain merchants is not enough.  This document is not

relevant. This witness cannot tie down this document to Sogro.

THE COURT: If that is the case, then perhaps they will not be received.

MR. BORCIA: This witness, who I just learned of about five seconds ago, this witness who was supposed to be called was Benjamin Wong. He was the one disclosed in discovery.

The Federal Rules require disclosure of witnesses not categories of witnesses. And for me to have to now learn of this witness five minutes before he is going to be called is wrong.

There was interrogatories issued to this plaintiff, disclosure witnesses. There was a pretrial order. Your Honor ordered us to disclose names of witnesses. This gentleman's name is not on either one of them.

There's also Rule 26 disclosures. This gentleman's name is not on either -- any of those either. This is not proper procedure to have witnesses pop up during a trial that were not previously disclosed. And the fact that he's a keeper of the records, or purported to be, does not excuse disclosure obligations.

The other exhibits in this document reference similar issues. Exhibit No. 2, again references certain merchants. Exhibit No. 3 talks about an industry wire mailed to all merchants. Again, there's no tie-in on this document to Sogro.

THE COURT: Again, I note that the plaintiff --

1   plaintiffs are not seeking to utilize the affidavit of Mr. Wong

2   nor Mr. Wong at this time.

3           MR. BORCIA:  Here's the problem with that, because if

4   they're not using the affidavit, and it sounds like you're

5   saying, they're going to have this man testify as to something

6   beyond the affidavit, that's not disclosed.

7           THE COURT:  Not necessarily something beyond the

8   affidavit.  I don't know.

9           MR. BORCIA:  Well, it has to be either in the

10  affidavit or not at all because whatever he's going to say, if

11  it's not disclosed, it's not proper.

12          And for him -- If Your Honor is suggesting that this

13  witness can now say something different than what's in this

14  affidavit, not only was he not disclosed but this testimony is

15  not disclosed.  He can't do it.

16          THE COURT:  All right.  Is there anything else with

17  regard to Exhibit 14?

18          MR. RAPHAEL:  Your Honor --

19          THE COURT:  Mr. Borcia is speaking.

20          MR. RAPHAEL:  Okay.

21          MR. BORCIA:  Exhibit No. 8.  I'm sorry, paragraph

22  number eight talks about Exhibit No. 5 was sent to those

23  merchants who our records showed were using point-of-sale

24  equipment that was noncompliant.

25          What does that mean?  And where are the records of who

1 the merchants were who were noncompliant?  It's not in this

2 document.

3    I'm just forecasting this now.  I see this as a train

4 wreck; and certainly on non-disclosed issues, I don't want to

5 keep interrupting the testimony, Judge; but I'll tell you right

6 now, looks like what's going to happen is, he's going to try to

7 ask him something different than what's in this affidavit.

8    If you look at the affidavit, virtually all of the

9 statements that are made are not tied to Sogro.  They are tied

10 to merchants in general.  That's not relevant.  Or certain

11 merchants; whatever that means.

12    THE COURT:  Is there anything else regarding this

13 exhibit and the proposed testimony of the Paymentech custodian

14 of records?

15    MR. RAPHAEL:  Your Honor, there was talk --

16    THE COURT:  No.  Mr. Borcia.

17    MR. BORCIA:  There was talk last night about an

18 Exhibit No. 6 -- I'm sorry, Your Honor -- Exhibit No. 9 of a

19 web page.

20    THE COURT:  This is 9 of 14?

21    MR. BORCIA:  Right.

22    THE COURT:  14-9.

23    MR. BORCIA:  Clearly, Exhibit No. 9 is not a web page.

24 We went through that last night.  I want to reiterate that was

25 discussed last night.

1          THE COURT:  Yes.

2          MR. BORCIA:  Other than that I have nothing else.

3  Thank you.

4          THE COURT:  Mr. Raphael.

5          MR. RAPHAEL:  Real quick, Your Honor.

6          THE COURT:  First of all, please address the

7  disclosure argument of Mr. Borcia.

8          MR. RAPHAEL:  Page 3 of 43 of document 195 in the

9  Court record, the parties' joint pretrial report.  If Your

10  Honor recalls, there were numerous sections of our joint

11  pretrial report that were not joint, which caused some problems

12  with the pretrial conference.

13          This was not one of them.  This was the names and

14  addresses of witnesses.  And Benjamin Wong or Chase Paymentech

15  keeper of records available to appear by Skype video was the

16  parties' joint production of names and addresses of witnesses.

17          And the defendant objected to all of this back then.

18  This is just the exact same objection here which the Court

19  already ruled on a number of times.

20          Second, the documents that we're seeking to have

21  introduced into evidence that were produced by Chase Paymentech

22  ought to have been produced, if we go back in time, by the

23  defendant when we issued discovery to them asking them to

24  produce all of the documents that they had in their custody and

25  control relating to compliance with FACTA.

1          Chase Paymentech is the entity that Sogro hired.

2    Sogro --

3          THE COURT:  That's beyond the point.

4          MR. RAPHAEL:  Okay.

5          THE COURT:  The point that Mr. Borcia raised and I

6    asked you to address is related to disclosure of the identity

7    of the person or persons who would be called as witnesses and a

8    particular person from Paymentech you envision testifying.

9          MR. RAPHAEL:  Yeah.  They were disclosed in the final

10   pretrial order.

11         THE COURT:  The pretrial report mentions Mr. Wong then

12   alternatively some other person.

13         MR. RAPHAEL:  Correct, from Chase Paymentech.  And we

14   did not know --

15         THE COURT:  When, if at all, did you disclose this

16   person to the defense?

17         MR. RAPHAEL:  As soon as we were certain of it, which

18   even at this moment due to the inclement weather, we're not

19   certain of because they were supposed to be there a half an

20   hour ago and are not.  But we believe it's going to be, rather,

21   Boehm.  I've never spoken to the man.

22         I've had numerous e-mails back and forth with Chase

23   Paymentech trying to nail down exactly who this person would

24   be.  And to the best of our knowledge right now it's going to

25   be this person.  But if he's not able to show up because of the

1    weather, then they may have someone as an alternative.  I just

2    don't know.

3         And just to make it clear, all these objections that

4    Mr. Borcia is raising are form over substance.  There's no

5    surprise here because this person is not testifying to anything

6    other than the exact same documents that have been in the

7    record for years.

8         These are -- there's -- He's not going to discuss

9    things outside of establishing the foundation for the way these

10   records have been created, used in the ordinary course of

11   business, stored in a reliable fashion at Chase Paymentech in

12   the ordinary course of business and so forth.

13        THE COURT:  All right.  I know -- I understand your

14   position.

15        The Court is going to give Mr. Borcia an opportunity

16   to voir dire this particular witness outside the presence of

17   the jury in a fashion similar to what is contemplated with

18   respect to the plaintiff's paralegal.

19        It is certainly no surprise that someone who is a

20   custodian of records of Paymentech is to testify on behalf of

21   the plaintiffs.

22        The documents with regard to such testimony have been

23   tendered previously and have been provided in conjunction with

24   other proceedings in this case; and, therefore, it would appear

25   that the defendant has had an opportunity to view and decipher

1   the documents as noted by some of the argument of Mr. Borcia

2   today.

3          The Court certainly has to consider whether or not it

4   will be fair or unfair to permit this witness to testify.

5   Inasmuch as the documents are no surprise, the Court does not

6   believe it will be unfair; and certainly it would be consistent

7   with the search for truth that the plaintiffs be allowed to

8   call a person who is identified as custodian of records.

9          Now, it certainly is also in the Court's view

10  appropriate to give to the defense this chance to examine the

11  witness to determine whether or not she or he is, in fact, able

12  to provide testimony that is certainly supported by whatever

13  credentials or familiarity this witness has with the practices,

14  procedures, and records of Paymentech.  That is the reason for

15  the examination outside of the presence of the jury.

16         Now, if this witness is not now available, we will

17  return to our discussion of other exhibits.

18         Is the witness still unavailable?

19         MS. KRUMHORN:  The court reporter is still setting up.

20  She was having a problem with the ethernet cable.  Should I

21  interrupt --

22         THE COURT:  Yes.  Please let us know as soon as you

23  get word that everything is set up and we can proceed with the

24  witness.

25         MS. KRUMHORN:  Okay.  Thank you.

1          THE COURT:  Mr. Borcia, I believe you'd like to be

2    heard regarding some additional matters.

3          MR. BORCIA:  Yes, Your Honor.  Going back to the

4    Court's discussion on our discussions last night.

5          I don't believe you accurately summarized in total at

6    least Exhibit No. 1 in terms of our objections.

7          THE COURT:  All right.

8          MR. BORCIA:  The primary objection we had to this is

9    that allowing introduction into evidence of thousands of

10   receipts and registration cards is allowing into evidence proof

11   from individual class members.

12         This case is not about plaintiffs, plural.  There is

13   one plaintiff in this case, Angela Velasco.  There are no other

14   plaintiffs in this case.  There was a class that she is

15   representing.  That class -- None of those class members are

16   identified as witnesses.

17         If the Court allows into evidence the evidence from

18   the individual class members, that will require us to inquire

19   into the details of the individual transactions for these

20   classes members; and that's important because Your Honor has

21   already ruled that only consumers can collect under the

22   statute.  Only consumers have claims.

23         These receipts do not demonstrate whether, in fact,

24   these are consumers, or businesses -- cards, or business

25   transactions.

1    So if that evidence is allowed into the record, we

2    will have to have individual inquiries into these receipts in

3    terms of whether the card is an individual card or a business

4    card; the transaction was a business transaction or a consumer

5    transaction.

6    There is no one in this courtroom identified as a

7    witness who will be able to establish those facts.  Certainly

8    Mr. Solus cannot do that.  Certainly the plaintiff cannot do

9    that.  I don't believe she's talked to any class members.

10    So that would leave the jury with the obligation to

11    speculate based upon a stack of receipts from witnesses they

12    have not heard whether those receipts are for consumer purposes

13    or nonconsumer purposes.  And that is the antithesis of a class

14    action.

15    A class action is where a class representative can

16    establish all of the elements of proof for the class members;

17    and but for the ability to do that, introducing these

18    individual -- these individual elements for class members into

19    evidence in this lawsuit is inappropriate.

20    The issue of redaction is one that this case is based

21    upon the plaintiff's claim that there is a privacy interest in

22    these receipts.  And I don't believe these class members have

23    any idea at this point in time that this Court is going to

24    allow into evidence in this lawsuit receipts with their

25    class -- with their credit card numbers on them.

1           So I think it's a real problem in this case which is

2     supposed to be about protecting privacy that we are now putting

3     into evidence in the case their names, when they stayed at the

4     motel, their credit card information, the amount they -- the

5     amount they paid.  None of this has been with their approval.

6     So I don't believe it's proper for many -- including the

7     reasons Your Honor said -- to put these receipts into evidence

8     in this lawsuit.

9           The issue of Exhibit No. 14, we went -- I think we

10    went through most of that already.

11          Exhibit No. 15 -- I'm sorry, I skipped Exhibit No. 3,

12    Your Honor.  The pages from Exhibit No. 3 are not relevant

13    because they go to -- basically they are activity reports.

14          The first document I believe Your Honor referenced was

15    2431, and that activity report from Paymentech, number one, is

16    pages 1 of 3 but only document page number one is attached.  I

17    don't even know what pages two and three are.

18          But it references simply -- and this is, again,

19    2003 -- I'm sorry, 2004.  This is long before FACTA even became

20    required.  And it references nothing about FACTA.  It

21    references that there's a Paymentech website that can be gone

22    to.

23          There's no tie-in to -- on that date.  Even if there

24    was a suggestion to go to the site, what would that site say?

25    So without that tie-in, it's not relevant to the issues in this

1    case.

2            And the same analysis goes to 2432.

3            2433 is a Discover activity report which, again, does

4    not reference FACTA.  I'm not sure what the purpose of it --

5    the relevance is of admitting this is.  Doesn't seem to be

6    relevant to any issues in this lawsuit.

7            2438 is, again, a Discover activity report from May of

8    2004.  Again, no reference to FACTA; no reference to

9    truncation.  And, again, this is -- It says page one of two.

10   No idea what page two is.

11           2442, similar.  This is a -- purports to be a

12   three-page document.  Only page one is attached.  Again, no

13   reference to FACTA or truncation.

14           2443 is a one-page Paymentech statement with just a

15   cover page of the statement dated September of '04.  Again, no

16   reference to FACTA; no reference to truncation.

17           2444 is a similar Discover three-page document that

18   only contains page one.  Again, no reference to truncation; no

19   reference to FACTA.

20           So similar objections, I think, flow to the other

21   documents within this exhibit.

22           THE COURT:  All right.

23           MR. BORCIA:  Exhibit No. 15 is our statements from

24   Paymentech to Sogro which are cherry-picked, one-page documents

25   out of entire statements that, again, don't reference FACTA; do

1    not reference truncation; not relevant to the issues in this

2    case.

3             The reference to -- to learn about a feature, visit

4    Paymentech.com, again, there's no tie-in to -- even if you went

5    to the website on that date, what would it say?  How is this

6    relevant to this lawsuit?

7             Exhibit 21, which counsel referred to as the books

8    from Visa, I have no idea what witness is going to introduce

9    the foundation for these documents.  There is no witness

10   disclosed from Visa.  Mr. Solus can't authenticate the

11   documents.  I doubt very much that the Paymentech or the

12   Discover witnesses can identify or authenticate Visa manuals.

13   And so certainly there's been no disclosure of any witness that

14   could authenticate the foundation for this document.

15           Beyond that --

16           THE COURT:  I would assume the same objection would

17   apply to the similar exhibits, ie., 22, 23, 24 and 26?

18           MR. BORCIA:  Yes, and --

19           THE COURT:  All right.

20           MR. BORCIA:  The other issue is relevance.  This is

21   not a case about Visa or Discover or American Express and

22   whether or not Sogro met their rules.

23           And this -- We spent half the day yesterday, Judge, on

24   a contract with Mr. Solus and Paymentech.  This is not a breach

25   of contract case.  This is not a case of whether or not

1    Mr. Sogro met Visa's rules or Discover's rules.  This is about

2    a federal statute.  The complaint is limited to a federal

3    statute.  There's no breach of contract claims here.  And yet

4    we are getting into whether or not Sogro breached its agreement

5    with Paymentech, Visa, Discover.  That's not what this case is

6    about.  And that element has taken over this case.

7         The fact that Visa had whatever rules they had on

8    truncation, or Discover had, that is not the issue in this

9    case.

10        The issue in this case is a single claim on a federal

11   statute whether or not that statute was violated.  That's it.

12        So beyond just the fact there's no witness to

13   authenticate these documents, handing a jury a book of here's

14   Visa's rules and plopping it on a desk and say, here; that's

15   not relevant to the claims in this case.  I don't see Visa

16   being a plaintiff.  Why are we getting into all these Visa

17   regulations and Discover regulations?

18        If, in fact -- Let's pose a hypothetical.  If FACTA

19   was never enacted, would these documents have any claim at all

20   or any relevance?  Absolutely not.  The plaintiff here has no

21   standing to raise any kind of claim on behalf of any of these

22   credit card companies or Paymentech.

23        THE COURT:  That's certainly true, and these --

24   whether or not there was a breach of contract is not certainly

25   a clear issue in this case.  So I will ask the plaintiffs to

1    comment on why these particular documents should be received.

2    But I'll let you finish first.

3              MR. BORCIA:  Thank you, Your Honor.

4              I think in terms of -- In terms of --

5              THE COURT:  Please move it along because we have a

6    jury sitting in the room, and I want to make sure that they are

7    not frustrated to the point of becoming, let's say, less than

8    attentive to your case.

9              MR. BORCIA:  I'm trying, Judge.

10             Exhibit 26, I think is what counsel referred to as the

11   Discover exhibits to the declaration of Ms. Back; and, again --

12             THE COURT:  One second.

13             MR. BORCIA:  Sure.

14             (Discussion held off the record.)

15             MR. RAPHAEL:  They can know that there's a storm in

16   Texas, I guess.  That way we can blame it on that.

17             MR. BORCIA:  The issue of the documents for Ms. Back,

18   which I think is Exhibit No. 25, Judge -- I may have

19   misspoke -- again, these are -- apparently, the one introduced

20   Discover's rules, Discover's regulations.  And, again, it's the

21   same issue.

22             THE COURT:  All right.

23             MR. BORCIA:  So I won't repeat it, but I think Your

24   Honor --

25             THE COURT:  There's no reason to repeat.  I

1 understand.

2 MR. BORCIA: And that also attaches activity reports,

3 which are similar to the activity reports -- I think some of

4 these are duplicate documents in Exhibit 25 that were in the

5 prior documents.

6 MR. RAPHAEL: Your Honor, the activity report that's

7 in there --

8 THE COURT: Let him finish, please.

9 MR. BORCIA: I was done, Judge. Thank you.

10 MR. RAPHAEL: I was going to say it's in there in

11 error.

12 THE COURT: Twenty-five?

13 MR. RAPHAEL: Yeah, whatever activity report --

14 THE COURT: I did not have 25 listed. I have 21, 22,

15 23, 24 and 26.

16 MR. RAPHAEL: I was just addressing what he was

17 saying.

18 MR. BORCIA: Counsel misspoke. I think he meant to

19 say 25 because 26 is the affidavit of Ms. Pugal.

20 Twenty-five -- I assume what he's talking about are, those are

21 the documents -- the Discover affidavit, at least in my book.

22 THE COURT: All right.

23 Mr. Raphael.

24 MR. RAPHAEL: Yes, super brief.

25 As to these rules for Visa merchants, Your Honor

1    wanted me to comment on them.

2           THE COURT:  Yes.

3           MR. RAPHAEL:  All right.  Well, it's the plaintiff's

4    burden to show that Solus violated the law with reckless

5    disregard; not just he violated the law.

6           So all these rules, regulations, and other materials

7    that he ignored that would have brought him into compliance

8    with FACTA demonstrate bit by bit the vast nature of his

9    reckless conduct because not only did he disregard the federal

10   statute claiming I had no idea about it, he disregarded the

11   rules that he was bound to under a contract because he never

12   read those.  Then he disregarded all these notices that were

13   sent to him that told him about the rules, told him about,

14   also, the federal statutes, the state statute that exists here,

15   and explained to him in a point-by-point fashion how to comply.

16          Specifically, Your Honor, if you were to look at --

17   and I'm going to direct you to exhibit what -- yeah, Exhibit

18   21, page 26.

19          THE COURT:  How do you envision getting Exhibit 21

20   into the record?

21          MR. RAPHAEL:  Oh, okay.  I was just going to go to the

22   relevance part; but if you want me to move on, fine.

23          Number one, the Court -- This would come into the

24   record because it's authenticated.  It's a judicial notice of

25   adjudicated facts -- I'm sorry.  There's --

1          Actually, there's a number of ways.  First it is, 201,

2     judicial notice of adjudicated facts.

3          THE COURT:  There's been no prior request that this

4     Court take judicial notice of this particular document or

5     similar documents.  And, generally speaking, if you were to

6     make such a request, the defense should have an opportunity to

7     address that.

8          MR. RAPHAEL:  Uh-huh.

9          THE COURT:  And, secondly, how can this Court take

10    judicial notice of this particular document when there's no

11    showing by you that this is something that a court should look

12    at or has looked at or would in any way be brought to the

13    attention of the court.

14         MR. RAPHAEL:  Uh-huh.

15         Well, typically, my understanding is when you ask the

16    court to take judicial notice -- or you do it at the time

17    you're seeking to introduce it; so I would have done it during

18    the course of the conclusion of Chase Paymentech's testimony on

19    the other things referencing -- going to these documents; but

20    in addition to that, under Rule 803.17, there's a commercial

21    publication generally used by the industry, which these are.

22    These are all operating guidelines used by the entire

23    federally-regulated banking and credit industry that are

24    published on a yearly basis and under *Montalvo versus Bekins,*

25    which is 613 F. Supp. 2d, 892, Southern District of Texas 2009,

1    these types of publications would come in.

2          If you note that these publications, for example,

3    number 21, they are copyrighted materials by Visa.  They are --

4    They are the complete version of those documents with not only

5    page numbers on every page, but where they're intentionally

6    left blank there's a notation for things like that.

7          So there's no indication whatsoever that these

8    documents are not what they purport to be.

9          THE COURT:  Is there anything else that would support

10   receipt of the rules of the various credit card companies?

11         MR. RAPHAEL:  Yes, I'm sorry, one more item.

12   Mr. Borcia opened the door to the introduction of these

13   documents also for rebuttal purposes because he stated in his

14   opening, and Mr. Solus reiterated it during his direct, that

15   somehow this is all to blame on Paymentech not me.

16         These documents set forth the actual and true

17   relationship between the parties and who's responsible for

18   what.

19         Compliance with FACTA is the responsibility of the

20   merchant themselves who owns or leases the point of service

21   terminal not the processor who is the intermediary, as

22   Mr. Borcia explained to the jury, between your bank and the

23   merchant's bank.

24         The Visa rules for merchants explains, guess what,

25   it's the merchant's responsibility to be compliant.  Oh, in the

1    agreement between Mr. Sogro -- I'm sorry, between Sogro, Inc.

2    and Paymentech says, you are required to follow the Visa rules,

3    the Discover rules, whatever card association rules that you

4    are seeking to get authority to accept.

5            THE COURT:  All right.  Is there anything else?

6            MR. RAPHAEL:  I believe these rules are also in the

7    public record because they are filed every year with the

8    government, but I'd have to go find another copy of these.

9            THE COURT:  All right.  Do we have our witness

10   available?

11           MS. KRUMHORN:  They're still having the Internet

12   issues.  They were actually wondering if they could do it via

13   phone.

14           THE COURT:  Mr. Borcia.

15           MR. BORCIA:  I need to be able to see the witness.

16           MR. RAPHAEL:  I can let him see the witness on my

17   computer here, but -- because of the storm they must have no

18   Internet at the moment.

19           THE COURT:  We will have to come back to this witness

20   at a later time.

21           MR. RAPHAEL:  We can do the direct of our client at

22   the moment if that will move things up.

23           THE COURT:  Let's take a short break, and that will

24   give you a chance to figure out how you want to proceed.  We'll

25   come back to these evidentiary issues as warranted.  We'll take

1    about a ten-minute break.

2            THE BAILIFF:  All rise.

3            (A recess was taken from 10:01 a.m. to 10:32 a.m.)

4            THE COURT:  I would like to inquire as to the status

5    of the plaintiff's witness in Dallas.

6            MR. RAPHAEL:  Your Honor, I have the plaintiff's --

7    I'm sorry.  I have the witness's lawyer on the phone right now.

8    If she can dial in, she can give you an update as to their

9    situation there directly.

10           THE COURT:  What do you understand the situation to

11   be?

12           MR. RAPHAEL:  I understand the situation to be that

13   they don't have, for some reason, WiFi.  I've proposed a number

14   of --

15           THE COURT:  They're having an Internet connection

16   problem?

17           MR. RAPHAEL:  Yeah, they have a no-Internet-connection

18   problem.  The lawyer says, can we call in because, you know,

19   the witness can be cross-examined just as easily on the phone

20   as over --

21           THE COURT:  I need to know whether or not there is a

22   problem establishing a connection to Dallas so that the witness

23   can testify by video.

24           MR. RAPHAEL:  Yes.  They cannot access the Internet

25   for some reason.

1          THE COURT:  And is there anything else that is

2    problematic with regard to this witness's testimony?

3          MR. RAPHAEL:  Yes.  There is a storm impending that is

4    of such magnitude that the lawyer for the witness has said to

5    me that they will likely leave as soon as they are done giving

6    their testimony here today.

7          They do not believe that Paymentech, being part of the

8    company, will be open tomorrow because of the storm in Dallas.

9    They don't have the type of equipment we have up here to deal

10   with things like this.  And so they're -- They all sound very

11   nervous to me as to them sitting there right now.

12         THE COURT:  What do you propose as a solution to this

13   problem other than having the witness testify by phone?

14         MR. RAPHAEL:  I have no other solution that I can even

15   think of because my backup via Skype wouldn't work given the

16   fact that they don't even have Internet connection.

17         I would re -- renew my request that the documents

18   attached to Benjamin Wong's affidavit be admitted into evidence

19   in support of Benjamin Wong's affidavit.  And in lieu of that,

20   I would ask that the witness be allowed to establish the

21   foundation for the documents over the phone.

22         It's just an act of God at this point that is

23   preventing me from authenticating literally just documents with

24   the keeper of record.  And these documents are -- oh, I would

25   say, absolutely central to the entire case of the plaintiff

1    because they directly demonstrate the defendant's recklessness
2    with regard to violating the statute.

3            THE COURT:  All right.  Let me turn to the defense.

4            MR. BORCIA:  The issue in this situation is one that I
5    was concerned about weeks ago that when the Court over my
6    objection allowed Skype testimony, this is one of the problems
7    that can happen with allowing this type of --

8            THE COURT:  This isn't Skype testimony.

9            MR. BORCIA:  Well, it's video testimony that I
10   objected to.

11           THE COURT:  That's different.

12           MR. BORCIA:  And the general federal rules is that,
13   you know, you have to have witnesses live.

14           This is Mr. Raphael's case.  We're in his case.  He
15   has the burden of proof.  He has the burden to bring witnesses
16   to the courtroom.  And over my objection, Your Honor allowed
17   video testimony.

18           I don't know what's going on in Dallas.  I do know
19   that I'm very concerned about where this case is at this point
20   in time.  This jury has been delayed this morning for more than
21   an hour and a half now because of this situation.  That is no
22   cause of the defense.  We are in the plaintiff's case, and the
23   plaintiff should have a witness here to testify and doesn't.

24           THE COURT:  All right.  And what is your position
25   respecting telephonic testimony?  Do you persist in your --

1          MR. BORCIA:  Yes.

2          THE COURT:  -- position that the witness should come

3    to court?

4          MR. BORCIA:  Yes.  Witness -- Telephone testimony

5    doesn't allow either me or the jury to view the witness's

6    demeanor, his -- his nonverbal gestures.  It's just not

7    sufficient.  And certainly the federal rules, I don't believe,

8    allow, generally speaking unless there's a stipulation,

9    telephone testimony.

10          THE COURT:  All right.

11          MR. RAPHAEL:  We're again speaking about a record

12   keeper.

13          THE COURT:  All right.  Let me just get to the bottom

14   line.  The Court is not going to authorize the witness to

15   testify by telephone.  However, the Court will give you an

16   opportunity to have this witness testify later in the case.

17          The next question is, when, if at all, will the

18   witness be available to testify later in the case?  Now it is

19   uncertain when that witness can testify.

20          And so what I would like to do is to have the clerk

21   attempt to get the witness and/or the witness's lawyer on the

22   phone to discuss the availability of the witness to testify at

23   another time.

24          MR. RAPHAEL:  The number for the witness's lawyer is

25   (214)849-3437.  And I can hang up with them right now.

1    Christina, are you there?  The Court is going to call you.

2    Okay.  One minute.  All right.

3              THE CLERK:  What is the lawyer's name?

4              MR. RAPHAEL:  Christina.

5              MS. KRUMHORN:  Vitale, V-I-T-A-L-E.

6              THE CLERK:  Thank you.

7              MR. BORCIA:  I would just like to make one further

8    note.  This witness was known to the plaintiff during the

9    discovery period.

10             The plaintiff actually got an affidavit from this

11   witness or from who was supposed to be this witness, Mr. Wong,

12   during the discovery period.

13             This witness was not deposed.  For whatever reason,

14   the plaintiff chose not to depose this witness.  And all of

15   this could have been avoided had the plaintiff actually done

16   due diligence and deposed this witness.

17             THE CLERK:  Ms. Vitale.

18             MS. VITALE:  Yes, I'm here.

19             THE CLERK:  You're on the speaker system in the

20   courtroom in Judge Clevert's chambers.  Thank you.

21             MS. VITALE:  Good morning, Your Honor.

22             THE COURT:  Good morning.

23             I have you on the speaker phone in the courtroom, and

24   it has been brought to the Court's attention that the custodian

25   of records who was to testify today is unable to testify

1   because of several problems and, in particular, an inability of

2   someone in Dallas to establish an Internet connection needed to

3   provide the video testimony due to a snowstorm that is under

4   way.

5          Can you confirm that that is so?

6          MS. VITALE:  Yes, Your Honor.  We at Paymentech

7   provided the ethernet and the modem for the court reporter to

8   connect.  She was able to register the connection on her

9   laptop, but for some reason we are unable to get any web page

10  or any Internet connection to show up on her computer.

11         We are also faced with a continuing snowstorm.  The

12  roads were a little better today, but it's supposed to get

13  worse as we go towards the late afternoon/evening with black

14  ice hitting the roads.  And, unfortunately, we are not as

15  equipped as the Midwest to handle the snow and the ice in

16  Texas.  There are no snowplows.  They barely put salt on the

17  roads.  And it's very dangerous because the ice is just

18  completely covering the roads.

19         So I don't even think Paymentech will be open

20  tomorrow, maybe even into Thursday.  So that is why we were

21  hoping that we could do this limited narrow scope of testimony

22  as to the foundation of the documents by telephone.

23         THE COURT:  All right.  Will the witness be available

24  to testify at a later time if this matter -- if the witness's

25  testimony cannot be given today because of the reasons you have

1    stated?

2          MS. VITALE:  It would depend when, Your Honor.  I

3    mean, he has basically cleared his schedule for yesterday and

4    today waiting around to testify.

5          I believe there was a manager's convention going on

6    which he is missing.  And if Paymentech is not open, you know,

7    tomorrow and through the next day, it's difficult to predict.

8          You know, of course we'll make accommodations as Your

9    Honor decides; that it would be ideal and less of a burden on

10   the witness to testify by telephone for the limited scope of

11   authenticating these particular documents.

12         THE COURT:  All right.  Thank you very much.

13         We will have a discussion.  I will have a discussion

14   with the lawyers at this time.  And I will excuse the witness

15   from testifying today.

16         The Court is considering whether or not to give to the

17   defense an opportunity to examine the witness prior to the

18   witness testifying here in court.

19         Can the witness be made available for that purpose on

20   a date other than the actual trial date?

21         MS. VITALE:  You mean, Your Honor, like next week

22   or --

23         THE COURT:  Perhaps later this week.  What I have in

24   mind at this time is the possibility of continuing this trial

25   into next week.

1          MS. VITALE:  Maybe.  I would need to consult with the

2     witness and just see his schedule and make sure he's not

3     traveling or anything.

4          It's just -- You know, we have the witness here.  We

5     have the court reporter here.  I'm here.  We're all here.  And

6     the defense would have an opportunity to cross-examine, you

7     know, by telephone.

8          We have produced the witness like the, you know, Court

9     had wanted and cleared his schedule for yesterday and today.

10     We even drove in yesterday when Paymentech was technically

11     closed.  It was very difficult.  And I would just hope that we

12     can lessen the burden on this witness if we just go by

13     telephone today for the limited scope of the document

14     authentication.

15          THE COURT:  The defense has not had an opportunity to

16     examine this witness and is claiming, among other things, that

17     the identity of the witness was not previously known to the

18     defense; and, therefore, the witness should not be allowed to

19     testify at all.

20          But notwithstanding that, the Court has indicated that

21     the witness will be allowed to testify subject to prior

22     examination outside of the presence of the jury.  Because we

23     are in -- we are in trial, and the jury is in the jury room,

24     the Court does not at this time believe it can allow the

25     defense to conduct that examination here and now.

1          Instead, the examination will have to take place prior

2     to any in-court or live testimony in front of the jury.  I am

3     looking at my schedule.  And in light of what you've said,

4     there certainly is the possibility of conducting further

5     proceedings in this case later this week or the first part of

6     next week.  I certainly understand the weather problem which

7     certainly complicates matters.

8          MS. VITALE:  Your Honor, if you would indulge me,

9     could you maybe give us a little bit of time to think outside

10    the box here and be creative because I would hate to have us

11    all come back and, you know, just have to reconvene especially

12    with the weather unpredictability and schedules of everyone.

13         Would you be willing to give us about an hour to try

14    and figure this out?  Maybe we think outside the box creatively

15    and get an Internet connection somehow.

16         THE COURT:  I think that would certainly be very, very

17    helpful; and perhaps it will bear fruit.

18         MS. VITALE:  Okay.  I appreciate that, Your Honor.

19         THE COURT:  So I will have the -- Would you please

20    call back within an hour and you can talk with my staff.  And

21    to the extent we can, we'll then try to get back on the phone

22    here in the courtroom to see how we may be able to proceed.

23         MS. VITALE:  Yes, Your Honor.  What is the best number

24    to reach your staff at?

25         THE COURT:  (414)297-1585.

1        MS. VITALE:  Okay.  Will do.  Thank you so much.

2        THE COURT:  Thank you.

3        MS. VITALE:  Bye-bye.

4        THE COURT:  What I would like to do is continue with

5 the testimony of Mr. Solus at this time unless you have another

6 witness available.

7        MR. RAPHAEL:  We can do our plaintiff.

8        THE COURT:  Does the defense object to interrupting

9 the testimony of Mr. Solus and the Court hearing the

10 plaintiff's testimony?

11        MR. BORCIA:  No, Your Honor.

12        THE COURT:  All right.  All right.  We'll put the jury

13 on notice that we will start in five minutes or so.  All right?

14        Please get all of your exhibits concerning this

15 witness together so that you can seamlessly proceed with her

16 testimony.

17        If there are exhibits that you plan to use but have

18 not specifically identified for the defense, please make sure

19 that the defense is fully apprised of what exhibits you

20 envision using during the course of the witness's testimony.

21        MR. BORCIA:  Judge, could I just make one comment?

22        THE COURT:  Yes.

23        MR. BORCIA:  Just for scheduling purposes, I'm not

24 sure how long you're planning to go today.  I do have a

25 commitment for my son tonight.  If we could leave at 4:45,

1    5:00.  I just want to make sure we're not going to go late

2    because I need to be somewhere for him tonight, if that's okay

3    for you.

4              THE COURT:  We'll break.

5              MR. BORCIA:  I want to give you a heads up on it.

6              THE BAILIFF:  All rise.

7              (The following proceedings were held in the presence

8    of the jurors.)

9              THE COURT:  Again, I must apologize to you, members of

10   the jury.  We've been delayed this morning for a variety of

11   reasons that include weather-related problems and Internet

12   connection problems.

13             Also, I do want to bring to your attention that this

14   is one of those times when we will be proceeding in an unusual

15   way.

16             The Court is interrupting the testimony of the prior

17   witness, Mr. Solus, so that the named plaintiff, Ms. Velasco

18   can testify at this time.

19             This witness is, of course, being called by the

20   plaintiff who will proceed.

21             Mr. Raphael.

22             MR. RAPHAEL:  Yes, Ms. Velasco, would you step up.

23   And be sworn.

24             (The witness was first duly sworn under oath.)

25             THE CLERK:  Please state your full name for the record

1    and spell your last name.

2              THE WITNESS:  Angela Christine Velasco, V-E-L-A-S-C-O.

3              THE CLERK:  Thank you.

4                    D I R E C T   E X A M I N A T I O N

5    BY MR. RAPHAEL:

6    Q    Good morning.  Ms. Velasco, where do you work?

7    A    In Jewel Food Stores.

8    Q    Located where?

9    A    4042 West Foster Avenue in Chicago.

10   Q    How long have you worked there?

11   A    Twenty-two years.

12   Q    And what do you do there?

13   A    I'm a deli clerk.

14   Q    Do you have any kids?

15   A    I do.

16   Q    How many?

17   A    Four.

18   Q    And how old?

19   A    Sixteen, 13, and then I have a six-year-old and a

20   four-year-old.

21   Q    Okay.  Have you ever taken them on vacation?

22   A    Not since I've had all four.

23   Q    Okay.  Fair enough.  When was -- Here, let me take you more

24   directly.

25              Have you ever been up to Lake Geneva for a vacation

1    or --

2    A   I have.  When I had the two child -- When I had the two

3    children and then when I had my third one I had been up there.

4    Q   Okay.  And you stayed obviously at what hotel?

5    A   We stayed at the Budget Host Motel.

6    Q   Budget Host Diplomat Motel?

7    A   Yes.

8    Q   The one in Lake Geneva.  All right.

9           And do you know where that's located in terms of a

10   street, or do you remember?

11   A   (No response.)

12   Q   No.  All right.  Who did you go there with?  Which kids?

13   A   I have been there with my two oldest kids.

14   Q   Okay.

15   A   And I was there one time with my daughter, also.

16   Q   What did you do while you stayed there?

17   A   Swim and then go on, like, the boat tours.  They have boat

18   tours.  Horseback rides, but we didn't go on them.  We just

19   show the kids they have a horse and a carriage and go by the

20   beach.

21   Q   And one of the times you stayed there was June 25th, 2007?

22   A   Yes.

23   Q   And checked out on June 26th, 2007?

24   A   Yes.

25   Q   And how did you pay for your visit?

1    A    With a credit card.

2    Q    Okay.  I'm going to show you a document numbered 2463,

3    which is Exhibit 6, tab 6 in the book; and it should be up on

4    the screen.  Do you see it?

5         And is that your signature there?

6    A    It is.

7    Q    All right.  And did the motel provide you with a copy of

8    that receipt?

9    A    They did.

10   Q    All right.  And if you look, does that receipt contain your

11   full credit card number and expiration date and full name?

12   A    It does.

13   Q    Okay.  And that's the same information that would be on the

14   front of your credit card that you used, right?

15   A    Yes.

16   Q    Did you file this lawsuit?

17   A    No, I did not.

18   Q    How did you find out about it?

19   A    Through a class action -- a paper that came to me in the

20   mail.

21   Q    Okay.  So you had heard some of the questions to members of

22   the jury about class actions and receiving class action notices

23   in the mail, and you received one from this case?

24   A    I did.

25   Q    And so that's why you became involved with this?

1    A    Yes.  That's how I became involved.

2    Q    Okay.  And what specifically happened that you remember as

3    a reason for you to become the named plaintiff or become the

4    head of the class action?

5    A    I believe I was -- I save my files and I go through them

6    every year.  And I just -- I called back and asked, you know,

7    is this a paper that I should keep or throw away.

8         And then I kept it every time.  They let me know there

9    was a trial coming up, and then that they'd always get back to

10   you about what happens, because it's a class action, so

11   everybody would know about it after the case was settled.

12        But then the person who was in charge of the case

13   left, and they needed somebody to come forward and say, yes, I

14   was there, and I did use my credit card and my numbers were my

15   whole numbers with the expiration date printed on the receipt;

16   so that's why I'm here today.

17   Q    Okay.  And why -- what caused you to want to take part and

18   step up when the named plaintiff no longer wanted to continue?

19   A    Because, like I was explaining, there was a wrongdoing that

20   could lead to identity theft with the numbers and -- and the

21   expiration date.

22        And I was a part of the class.  And I came so that

23   this won't -- you know, so that -- I guess this won't happen.

24   The numbers -- We knew that something was wrong; and to come

25   forward; that I would be one of the persons; that it won't

1    happen again or --

2    Q    Nothing happened to you specifically, though, right?

3    A    No.

4    Q    You kept your credit card receipt after this?

5    A    I did.

6    Q    And what did you do with it?

7    A    I usually shred -- Every year I go through my papers, my

8    old papers.  And then -- And then if they're not good, if I

9    don't need them any more, I shred them.

10   Q    And do you know if you shredded this one?

11   A    Most likely.

12   Q    Okay.

13   A    That's my kids' fun.  They put the papers in the shredding

14   machine.  Like every year that's what we do, we clean out the

15   cabinet.

16   Q    Okay.  So then if you kept your credit card receipt and

17   shredded it, so what's the problem that you see that happened

18   in this case with printing off the receipts for all other class

19   members?  If you know.

20   A    That -- I do know now -- I do know that there's not

21   supposed to be so many numbers on the receipt; just like your

22   bank statements, they cross out so many and -- with Xs and then

23   leaving only a few of the last numbers.  So it was something --

24   it was too many numbers.  It was where that can lead to

25   identity theft.

1    Q   Okay.  And so you know that they're not supposed to do that

2    then?

3    A   I know there's many laws; they don't allow you to -- how --

4    yeah.

5           MR. RAPHAEL:  Okay.  All right.  Nothing further.

6           You can stay there.

7           THE COURT:  Cross?

8           MR. BORCIA:  Yes, Your Honor.

9              C R O S S - E X A M I N A T I O N

10   BY MR. BORCIA:

11   Q   Good morning, ma'am.

12   A   Good morning.

13   Q   You live in Chicago?

14   A   I do.

15   Q   And you've lived in Chicago for how long?

16   A   My whole life.  Do you want me to tell you my age?

17   Q   I don't need to hear your age.

18           Counsel asked you about your visits to the Budget

19   Motel.  Do you recall that?

20   A   I'm sorry.

21   Q   He asked you about your visits to the motel.

22   A   Yes.

23   Q   He asked you who you went there with?

24   A   He asked me.  Yeah, I've been there a few times.

25   Q   He asked you who you went there with.

1   A   Yes.  As far as -- Specifically for the one time, yes.

2   Q   And you mentioned your children?

3   A   Yes.

4   Q   And anyone else with you?

5   A   I've been there a few times.  The first time I've been

6   there was Labor Day Weekend before the school started.  That

7   was with my mother.  She's the first one who will bring us out

8   there.  She always stays like for two days.  I go for one.

9        So the first time I went was with my -- I went.  I

10  drove my car.  My mother -- I met my mother there with my

11  sister -- my sister.  They drive together.

12       The second time I went with my two children.  And then

13  the third time when I used the credit card was with my

14  boyfriend and my two children.

15  Q   What is your boyfriend's name?

16  A   Randy Hilgart, H-I-L-G-A-R-T.

17       THE COURT:  One second, please.  I'd like to see

18  counsel at sidebar.

19            (A sidebar was held.)

20            (The following proceedings were held at sidebar.)

21       THE COURT:  They have now established an Internet

22  connection.  I just looked at the --

23       MR. RAPHAEL:  So when he's done with this, then we can

24  go with them.

25            THE COURT:  How much --

1      MR. RAPHAEL:  It shouldn't be too long.

2      THE COURT:  All right.

3      (The following proceedings were held in the presence

4  of the jurors.)

5      MR. BORCIA:  Could I have the last question and answer

6  read back, Judge?

7      THE COURT:  Go ahead.

8      (The last question and answer were read back by the

9  reporter.)

10 BY MR. BORCIA:

11 Q   Are you married, ma'am?

12 A   Divorced.

13 Q   So you went with your boyfriend, Randy, and your two

14 children?

15 A   Yes.

16 Q   Now, counsel asked you some questions about why you're here

17 today.  Do you recall that?

18 A   Yes.

19 Q   Now, when you went to the motel, you had no problems with

20 the motel in terms of your stay there?

21 A   I did not.

22 Q   And you paid for your room?

23 A   I did pay for my room.

24 Q   Okay.  And the -- You used your credit card to pay for the

25 room?

1    A    I did.

2    Q    Now, when you got the credit card receipt, you made no

3    complaints about the receipt, did you?

4    A    I did not.

5    Q    And your receipt had the full number on there?

6    A    It did.

7    Q    And you saw Mr. Solus at the motel when you were there?

8    A    I did.

9    Q    And you didn't say to Mr. Solus, there was a problem with

10   this receipt, did you?

11   A    I did not.

12   Q    And, in fact, you didn't know anything about this lawsuit

13   until you got a notice about it?

14   A    That is correct.

15   Q    And the notice that you got about the lawsuit, it advised

16   you a lawsuit was already filed, correct?

17   A    Yes.

18   Q    And that it was pending, right?

19   A    Yes.

20   Q    And when was the next time after you received that mailing

21   that you heard about the lawsuit?

22   A    The next time -- I only -- They only sent one flier out,

23   and then I'd call; and they said there was a case that was

24   pending.  So you just save the paper.  Then -- You know, if a

25   year passed by and I still had the paper like sitting around,

1    then I'd call and say is this something I should save.

2    Q    You didn't keep your receipt from the motel, did you?

3    A    I did not.

4    Q    So the motel that had your number on it, you threw away?

5    A    I shredded it.

6    Q    And there was no identity theft for you, correct?

7    A    There was not.

8    Q    You kept the receipt the entire time until it was shredded?

9    A    In a filing box, yes.

10   Q    Now, you became involved in this lawsuit not because you

11   were concerned about identity theft, correct?

12   A    Correct.

13   Q    You became involved in this lawsuit because the plaintiff's

14   law firm called you?

15   A    Well, I called them.  Well, I called them; and when the

16   person left, then they called me, asked me -- because I was a

17   person who was there and used the credit card.  It was

18   something that was filed before me.

19   Q    And the person that called you and asked you, they asked

20   you to become the plaintiff in this case?

21          MR. RAPHAEL:  Sidebar, Your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  Yes.  When somebody leaves, then they

24   need somebody else to come.

25   BY MR. BORCIA:

1   Q   Now, counsel asked you why you're here today; and you said

2   something about you were concerned about -- there was a

3   violation?

4   A   Yes.

5   Q   You're here today because you want to collect money?

6   A   I could -- Honest to God, I could care less.  I'm still

7   going to live with or without.  It's -- A class action means

8   that everybody -- if something -- a lawsuit that everybody has

9   a part of.

10   Q   So you're not -- you're not seeking any damages in this

11   case?

12   A   Nothing is -- There's a case that is pending, and I'm here

13   to testify.

14   Q   Ma'am, are you asking for money damages in this case?

15   A   I am not.

16   Q   Now, the issue of the receipt that you received from the

17   motel, when you were called to become the plaintiff, that

18   receipt was gone at that point in time?

19   A   Yes, it was.

20   Q   And after you became involved or asked to be involved with

21   the case, you became the class representative, correct?

22   A   Yes.

23   Q   Okay.  And -- But you haven't spoken with any members of

24   the class?

25   A   I have not.

1    Q    So you don't know for example, why they went to the motel?

2    A    No, I do not.

3    Q    You don't know if they used a business credit or a personal

4    credit card?

5    A    I do not know.

6    Q    You don't know if any of those individuals went to the

7    motel for business reasons or for pleasure?

8    A    No, I do not.

9              MR. BORCIA:  That's all I have.  Thank you, ma'am.

10             MR. RAPHAEL:  Redirect, Your Honor.

11             THE COURT:  Go ahead.

12             MR. RAPHAEL:  Thank you.

13                  R E D I R E C T   E X A M I N A T I O N

14   BY MR. RAPHAEL:

15   Q    You stayed at the hotel in 2007.  That's the receipt that

16   we were looking at before, right?

17   A    I did.

18   Q    All right.  And you know the lawsuit wasn't filed until

19   after you stayed there?

20   A    I do.

21   Q    Okay.  So you couldn't have known, obviously, about the

22   lawsuit at the time you stayed there because it didn't exist at

23   the time, did it?

24   A    It did not.

25   Q    Okay.  When you received notification of the lawsuit -- I

1    can't remember what you called it, whether it was a flier or

2    what opposing counsel called it -- but that was a court notice.

3    It had the caption of this lawsuit on it, didn't it?

4    A    It did.

5    Q    And just to make sure that there's no issue --

6              THE COURT:  Counsel, no editorial comments.  They're

7    not necessary.

8              MR. RAPHAEL:  All right.

9    BY MR. RAPHAEL:

10   Q    Do you know how much money your claim is worth in this

11   lawsuit?

12             MR. BORCIA:  Objection, Judge.

13             THE COURT:  Objection sustained.

14             MR. RAPHAEL:  He asked if she was looking for --

15             THE COURT:  I said -- You don't argue with me.

16             MR. RAPHAEL:  Okay.

17   BY MR. RAPHAEL:

18   Q    Well, you said you weren't seeking money for yourself.

19             Are you seeking damages for the class?

20   A    It's everybody in the class.  I mean, that's what a lawsuit

21   is.  It's everybody in the class.

22   Q    Okay.

23   A    It's not for yourself.  It's everybody who was there.

24   Q    And you consider yourself a member of the class?

25   A    I do.

1          MR. RAPHAEL:  Okay.  Thank you.

2          THE COURT:  Mr. Borcia.

3          MR. BORCIA:  No further questions.

4          THE COURT:  Does the jury have questions of the

5     witness?  If so, prepare your notes and hand them to the

6     bailiff.

7          Does anyone wish to have that opportunity?

8          (No response.)

9          THE COURT:  All right.  You're excused.

10         We will have to take another short break.  The IT

11    person has to come back to the courtroom with a video screen so

12    that we can proceed with other testimony.

13         So as I've said previously, do not conduct any

14    discussions with other members of the jury unless -- concerning

15    this case unless all members of the jury are present; and, of

16    course, also, avoid any information that might be available on

17    YouTube or Skype or whatever because you're not supposed to do

18    any research and consider only -- are to consider only the

19    testimony and evidence admitted here in the courtroom.

20         We'll try to start as quickly as we can and hopefully

21    we will get our connection.

22         (The following proceedings were held outside the

23    presence of the jurors.)

24         THE COURT:  Is there any matter the parties wish to

25    address with respect to logistics or evidentiary matters that

1  we can dispense with in just a couple of moments?

2          MR. RAPHAEL:  No, Your Honor.

3          THE COURT:  All right.  The IT man will be here as

4  quickly as he can get all the equipment back, and we'll start

5  after the connection has been made.

6          And I do want you to know that I have to take a

7  swearing in of a lawyer at noon or a little thereafter.

8          MR. RAPHAEL:  Just fresh out of the wrapper or --

9          THE COURT:  I'm not sure.  I'm not sure whether

10  someone is seeking to get admitted in this state or some other

11  state because I do have to handle matters for people in other

12  states.

13          Just recently, in fact last week, I had to swear in

14  somebody who wanted to be admitted to the Illinois Bar.

15          MR. RAPHAEL:  We have reciprocity, don't we?

16          THE COURT:  Under certain circumstances.

17          THE CLERK:  All rise.

18          (A recess was taken from 11:20 a.m. to 12:05 p.m.)

19          (The following proceedings were held outside the

20  presence of the jury.)

21          (The witness appearing in the video was first duly

22  sworn under oath by the court reporter in Dallas, Texas.)

23          TEXAS REPORTER:  Did you all want to put any

24  stipulations or agreements in the record?

25          THE COURT:  There are no stipulations or any of those

1    matters.  We're in the midst of trial, and this is live trial

2    testimony.

3              Mr. Raphael --

4              Well, let me do it this way.  I will give to the

5    defense the opportunity to ask initial questions outside the

6    presence of the jury inasmuch as the defense has expressed some

7    concern respecting the testimony of this witness and his

8    ability to testify in this proceeding.

9              Mr. Borcia, do you wish to take advantage of that

10   opportunity at this time?

11             MR. BORCIA:  Yes, Your Honor.

12             THE COURT:  All right.  Proceed.

13                       E X A M I N A T I O N

14   BY MR. BORCIA:

15   Q    State your name, sir.

16   A    Robert Lee Boehm.

17   Q    Where do you work?

18   A    For Paymentech, LLC.

19   Q    What is your position?

20   A    It's a group executive for clients at work and

21   implementations.

22   Q    Have you reviewed any documents to prepare for your

23   testimony today?

24   A    I'm sorry, can you restate that?

25   Q    Have you reviewed any documents to prepare for your

1    testimony today?

2    A   I reviewed the documents attached to the affidavit, yes.

3    Q   Okay.  And the affidavit you're speaking of Mr. Wong's

4    affidavit?

5    A   Yes, sir.

6    Q   Who is Mr. Wong?

7    A   He is a director within the --

8    Q   Who is Mr. Wong?

9           THE COURT:  Can you move a little bit to your left --

10    further left, please.  Further left.  To your left.  That's

11    great.

12           Proceed, Counsel.

13           MR. BORCIA:  There's a question pending.

14           THE WITNESS:  Ben Wong is a director within the

15    relationship management team --

16           THE COURT:  Repeat that slowly, please.

17           THE WITNESS:  Ben Wong is a director within the

18    relationship management team.

19    BY MR. BORCIA:

20    Q   Is he currently employed by Paymentech?

21    A   Yes.

22    Q   All right.  And the only documents you reviewed were his

23    affidavit and the documents attached to the affidavit?

24    A   Correct.

25    Q   And now do you have the document in front of you, the

1    affidavit with the documents?

2    A    Yes, sir.

3    Q    If you can turn to the affidavit and specifically Exhibit

4    No. 3.

5         Now, you didn't prepare this affidavit, correct?

6    A    Correct.

7              THE COURT:  One second.

8              MR. RAPHAEL:  Can we cite to the page number?

9              MR. BORCIA:  2534.

10             THE COURT:  Do you have that in front of you?

11             THE WITNESS:  Yes, sir.

12   BY MR. BORCIA:

13   Q    Okay.  If we go to paragraph three of that affidavit.  Mr.

14   Wong, states a review of Paymentech's records reflect that

15   Sogro was a Paymentech merchant.  Do you see that?

16   A    Yes.

17   Q    Do you know what records he's referring to there?

18   A    I witnessed via a screen share with a customer service

19   manager the ability to validate that particular merchant and

20   the merchant number type to that relationship.

21             THE COURT:  Yes.  Go ahead.

22   BY MR. BORCIA:

23   Q    I'm not sure I understand the answer.  Can you repeat that,

24   sir.

25   A    I spoke with the customer service manager and via a screen

1    share I was able to view that particular merchant record

2    displaying the merchant ID related to this account.

3    Q    And who did you speak with?

4    A    Debbie Sisic.

5    Q    Who is she?

6    A    She's a customer service manager.

7         THE COURT:  Please spell the name of the customer

8    service manager.

9         THE WITNESS:  I believe it's Debbie, D-E-B-B-I-E.

10   S-I-S-I-C.

11        MR. RAPHAEL:  Can I ask the witness, can you --

12   wherever the speaker phone is, move it as close to you as

13   possible.

14        THE WITNESS:  A lot better?

15        MR. RAPHAEL:  Well, you can make it as close as you

16   want just so that you can speak into it real loud.

17        THE WITNESS:  Okay.

18   BY MR. BORCIA:

19   Q    So you're not -- You're not sure what Mr. Wong reviewed,

20   but what you're saying is you reviewed a screenshot?

21        MR. RAPHAEL:  Your Honor, I'm going to object because

22   it's outside what Your Honor's scope was.

23        THE COURT:  Go ahead.  I'll allow it.  Proceed.

24        THE WITNESS:  I reviewed a screenshot related to this

25   particular merchant account.

1   BY MR. BORCIA:

2   Q    I understand that.  But you're not sure what records Mr.

3   Wong reviewed?

4   A    No, sir, I'm not.

5   Q    And you didn't prepare this affidavit?

6   A    No, sir, I did not.

7   Q    Now, paragraph four states Exhibit 1 attached to the

8   affidavit is a document created on or about March 4 --

9   March 2004.  Do you see that?

10  A    Yes, I do.

11  Q    If we can reference Exhibit No. 1 there, do you have that

12  handy?

13  A    Yes, I do.

14  Q    Okay.  And are you able to confirm that Exhibit No. 1 was a

15  document created on or about March 2004?

16  A    Yes, sir, I am.

17  Q    How?

18  A    For two reasons.  I was part of the project team at the

19  particular time where this initiative was taking place.

20          And then, secondly, reviewing an internal document

21  that contained the metadata attached to the slide that

22  indicated a creation date of March of 2004.

23  Q    Where is that metadata?

24  A    It's contained within the document.

25  Q    Okay.  Is there a date on the document I'm missing?

1          The document, Exhibit No. 1, itself does not have a

2    date, correct?

3    A    That's correct.

4    Q    But you're saying that from metadata you're able to

5    determine the date of creation?

6    A    Correct.

7    Q    And now it states here that the document was mailed to

8    certain merchants.  Do you see that?

9    A    That's correct.

10   Q    All right.  And --

11         MR. RAPHAEL:  Your Honor, again, I'm going to object

12   to any sort of cross-examination of something we're not even

13   intending to bring in.  Just Mr. Wong's --

14         THE COURT:  Overruled.

15         MR. RAPHAEL:  Okay.

16   BY MR. BORCIA:

17   Q    When it says mail, would that have been U.S. Mail?

18   A    Yes, sir.

19   Q    And it says certain merchants.  Who were the certain

20   merchants?

21   A    A project team determined based on the type of equipment a

22   merchant was using if there was a high probabilty of that

23   terminal not being compliant so that would have -- that was our

24   target audience for the communication.

25   Q    Okay.  And do you know whether or not Sogro would have been

1    included in those certain merchants?

2    A    I do not have knowledge related to Sogro related to this --

3    the mailings.

4    Q    Okay.  Now, it says Exhibit No. 2, if you can refer to

5    that, would your answer be the same for Exhibit No. 2 in terms

6    of where it says certain merchants; you can't tell whether or

7    not that mailing was ever mailed to Sogro?

8    A    That's correct.

9    Q    Okay.  Now, Exhibit No. 3, it says it's a publication.  Do

10   you see that?

11   A    Yes, sir.

12   Q    And where was the publication?  Where was it published?

13   A    The publication was created in order to communicate to all

14   of our merchant base related to any --

15        THE COURT:  You said related to any, and then would

16   you go and repeat what you said earlier.

17        THE WITNESS:  Any card brand changes or

18   compliance-related items.

19   BY MR. BORCIA:

20   Q    And just -- My question, I guess, was different.  Maybe my

21   question wasn't good enough, artful enough.

22        When it's published, is that something that you

23   actually put out in some publication or something you mail, or

24   both?

25   A    This type of document generally would be mailed to

1    merchants.

2    Q    Okay.  Was this one mailed or --

3    A    Yes, sir.

4    Q    Okay.  And it was mailed, it says, to all merchants.  Do

5    you see that?

6    A    Yes, sir.

7    Q    All right.  So that would have been all merchants within

8    Paymentech's system at that point in time?

9    A    That is correct.

10   Q    And the date of September of '04, where does that come

11   from?

12   A    Again, viewing the document, looking at the metadata

13   contained within the document confirmed the creation date of

14   September of 2004.

15   Q    Okay.  But that's -- that's when the document was created,

16   correct?

17   A    That is correct.

18   Q    That would not tell you necessarily the date that it was

19   mailed?

20   A    Correct.

21   Q    So are there any records that would tell you when it was

22   actually mailed?

23   A    I do not have those records.

24   Q    I assume there's no record that would show specifically

25   this publication being mailed to Sogro; is that correct?

```
1    A    That's correct.
2    Q    And would your answer for paragraph seven, Exhibit No. 4,
3    be the same as with the prior exhibit in terms of that
4    publication in terms of your answers to that publication as
5    well; the same answers you'd give for that?
6    A    Related to Sogro and whether they received this
7    communication?
8    Q    Right.
9    A    Yes, the answer would be the same.
10   Q    Okay.  Now, in Exhibit No. 4, do you see there's a
11   reference there to noncompliance fees?  Do you see that?
12   A    In the actual exhibit?
13   Q    Yes.  Exhibit 4.
14            MS. VITALE:  Your Honor, if I may interject, Exhibit 4
15   is not being offered into evidence based on agreements with
16   Lance Raphael.
17            MR. BORCIA:  That's not what we were told.
18            THE COURT:  The defense is -- The plaintiff is
19   attempting to get this particular exhibit into evidence?
20            MR. RAPHAEL:  No, I'm withdrawing that exhibit because
21   I understand that this witness doesn't have the same foundation
22   for it as Mr. Wong does.
23            THE COURT:  All right.
24            MR. BORCIA:  Well, that doesn't mean I can't ask him a
25   question about it.
```

1          MR. RAPHAEL:  Yes, but we're not moving to have it

2     entered into evidence.

3          MR. BORCIA:  Okay.

4     BY MR. BORCIA:

5     Q   Do you see there's a reference to noncompliance fees in

6     Exhibit 4?

7     A   Yes, I do.

8          THE COURT:  What is the relevance of this,

9     Mr. Borcia --

10         MR. BORCIA:  Well --

11         THE COURT:  -- in light of the plaintiff's intention

12    not to offer this exhibit?

13         MR. BORCIA:  The relevance is, Judge, that apparently

14    counsel wants to go down the path of noncompliance with Visa

15    and MasterCard and American Express.  There's no evidence

16    that -- I believe of any noncompliance assessment against my

17    client.

18         THE COURT:  Well, the purpose of this examination is

19    to ascertain whether or not this witness is qualified to

20    testify in front of the jury.  So I will direct that you

21    proceed to another question.  This matter is irrelevant.

22    BY MR. BORCIA:

23    Q   So you're not able to, though, authenticate Exhibit No. 4;

24    is that correct, sir?

25    A   I am familiar with the document in that -- in that I was

1    part of the project team; so this is a familiar document.

2    Q   You said is a familiar document?

3    A   It's a familiar document; me being a part of that project

4    team.

5             MR. BORCIA:  Okay.  Well, based on counsel's

6    representation that he's not going to go into Exhibit No. 4,

7    I'll move on.

8    BY MR. BORCIA:

9    Q   Exhibit No. 5, sir, there's a reference there to -- it

10   looks like a form letter.  Do you see that?

11   A   Yes, sir.

12   Q   Are you familiar with that document?

13   A   Yes, sir, I am.

14   Q   How?

15            THE COURT:  One second please.  Would you please

16   repeat your answer.

17            THE WITNESS:  Via the same contact within the merchant

18   customer service group, Debbie Sisic.  I was able to review

19   this document via a screen share.

20   BY MR. BORCIA:

21   Q   And the -- this document is simply a template, correct?

22   A   That is correct.

23   Q   And it doesn't have any specific information as to Sogro?

24   A   That is correct.

25   Q   In fact, the contact name and all that, that's all blank or

1    just a form, correct?

2    A    That is correct.

3    Q    Now, there's a reference in the second-to-last paragraph

4    where it says, you -- attempted to contact you via phone.  And

5    it's got specific dates in there.  Do you see that?

6    A    I do.

7    Q    Is that just part of the template?

8    A    This part is a template.  And once the agent can pull the

9    form down, they can populate those things.

10   Q    All right.  So this wouldn't have any reference to Sogro

11   being called on those dates?

12   A    That is correct.

13   Q    And there's no record that you're aware of that this letter

14   was ever sent to Sogro?

15   A    That is correct.

16   Q    Okay.  If we can move on to then to Exhibit No. 6.

17          There is a reference there to a printout where it says

18   the current version of the account number truncation rules.  Do

19   you see that?

20   A    Are you looking at the affidavit or --

21   Q    Yeah, I'm sorry.  I'm sorry, sir.  I'm looking at the

22   affidavit, Exhibit No. 6, and paragraph nine of the affidavit.

23   A    Can you repeat the question?

24   Q    Sure.  Sure.  Is that printout, what was at the time of

25   Mr. Wong's affidavit, the then current version of the account

1    number truncation rules on the website?

2    A    Yes, sir.

3    Q    So that would have been what was in place in 2011 when Mr.

4    Wong signed this affidavit?

5    A    This document was printed in 2010, then signed this

6    affidavit in early January.  This document was printed in 2010.

7    Q    So that's what existed in 2010?

8    A    That's correct.

9    Q    So this would not be what would have existed back -- let's

10   say back in the time period of 2006, 2008, correct?

11   A    This document dates back to 2008 with the printed date of

12   2010.  There could be changes related to this document prior to

13   that, but the content would be very similar.

14   Q    But there's no printout from 2008, correct?

15   A    That is correct.

16   Q    And then if he can move on to number seven, Exhibit 7 which

17   is part of paragraph ten.

18   A    Yes, sir.

19   Q    Would your answer be the same for that exhibit as the prior

20   exhibit in terms of what that document consists of?

21   A    Yes, sir.  I would say that the information dates back to

22   2008 but printed in 2010.

23   Q    When you use the date or the year 2008, you have a time

24   period in that year?

25   A    Yes, sir, April.

1    Q    April.  Okay.  April of '08 forward you're saying, correct?

2              MS. VITALE:  Say it again, Counsel.

3              MR. BORCIA:  Sure.  April of '08 going forward.

4              THE WITNESS:  April of 2008 until subsequent changes

5    were possible.

6    BY MR. BORCIA:

7    Q    I got it, okay.  All right.  Then if we go to Exhibit

8    No. 9.  I'm sorry, I'm going to skip one.  Exhibit No. 8, sir,

9    which is -- it says it's a text of an earlier version of

10   Exhibit 6 posted on our website on or before October 24, 2007.

11   Do you see that?

12   A    And, again, you're looking at Exhibit 9?

13   Q    I'm sorry, Exhibit 8.

14   A    Exhibit 8.  I'm sorry, can you repeat the question?

15   Q    Sure.  That document is a -- the text of an earlier version

16   of Exhibit No. 6.  It says it was posted on or about

17   October 24, 2007.

18   A    Yes, sir.  That is correct.

19   Q    And that -- You know that date how?

20   A    It was printed at the bottom of the page.

21   Q    So all you're going off of is whatever the screenshot says

22   at that point in time, correct?

23   A    Yes, and validating similar information on archive.org.

24             TEXAS REPORTER:  Counsel, I can't hear you.  You're

25   way in the background.

1  MR. RAPHAEL:  We don't require you to record or report

2  anything, ma'am.  We have a court reporter here.

3  TEXAS REPORTER:  Oh, my gosh, Judge.  Okay.  Okay.

4  MR. RAPHAEL:  Please just --

5  THE COURT:  Stand by, please.  Can the witness hear

6  us?

7  THE WITNESS:  Yes.

8  THE COURT:  Go ahead.  Mr. Borcia, ask another

9  question, please.

10  BY MR. BORCIA:

11  Q  Exhibit No. 9, moving on in paragraph 12, it states that

12  Exhibit No. 9 in the affidavit is a true and correct copy of a

13  text of an earlier version of Exhibit No. 8.  Do you see that?

14  A  Yes, I do.

15  Q  Now, Exhibit No. 8 was a screenshot, correct?

16  A  Correct.

17  Q  Now, is Exhibit No. 9 a screenshot?

18  A  No, it's a document.

19  Q  So -- I got it.  So this is the text -- One is the

20  affidavit, say, an earlier version of Exhibit No. 8.

21  A  You're looking at Exhibit No. 9 and -- Can you repeat the

22  question again?

23  Q  Sure.  In Mr. Wong's affidavit, in paragraph 12 he says,

24  Exhibit No. 9 is a true and correct copy of the text of an

25  earlier version of Exhibit No. 8.

1          Exhibit No. 8 appears to be -- I think you

2     confirmed -- a screenshot, but Exhibit No. 9 is not a

3     screenshot.  I'm wondering why did Mr. Wong describe it in that

4     manner?

5          MR. RAPHAEL:  Objection.  Mischaracterizes what it

6     says.  He didn't say it was a screenshot.

7          THE COURT:  Well --

8          MR. RAPHAEL:  It's text.

9          THE COURT:  -- can the witness understand the question

10    as asked?  Counsel, would you restate your question?

11         MR. BORCIA:  Sure.

12    BY MR. BORCIA:

13    Q    I'm just trying to get some clarity as to why Mr. Wong used

14    the language in paragraph 12 where he says, Exhibit No. 9 is a

15    correct copy of the text of an earlier version of Exhibit

16    No. 8, when Exhibit No. 8 was a screenshot of a website, and

17    Exhibit No. 9 you said is a document?

18         MR. RAPHAEL:  Your Honor, the witness has already

19    testified.  I object.  Lack of foundation.

20         THE COURT:  Objection overruled.  That objection is

21    overruled.  Is there another objection?

22         MR. RAPHAEL:  The witness has already testified he

23    didn't go through Mr. Wong's affidavit.

24         THE COURT:  That objection is overruled.  Is there

25    another objection?

1        MR. RAPHAEL:  Form of the question; but other than

2   that, no.

3        THE COURT:  That objection is overruled.  Can the

4   witness answer the question if you can recall it?

5        THE WITNESS:  So the question is, why does then --

6   answer -- Can you restate the question, please.  My apologies.

7   BY MR. BORCIA:

8   Q   I'll try again.  No problem.

9        Maybe I'll try to make it more clear.

10       So Exhibit 8, you said, was a screenshot of a website,

11  correct?

12  A   Correct.

13  Q   Exhibit 9 you said is a document?

14  A   Yes.

15  Q   So the words that Mr. Wong used was, Exhibit 9 was the text

16  of an earlier version of Exhibit No. 8.

17       And my confusion is, because one is a website printout

18  and one's a document, do you know why he used that language?

19  A   I do not know.

20  Q   Going to Exhibit No. 9, what is that document?

21  A   It's the text version of what was contained on Exhibit 8.

22  Q   And when you -- I'm sorry, I didn't mean to cut you off.

23  Finish your answer.  I didn't mean to cut you off.  I'm sorry.

24  A   It would be a text version of Exhibit 8 that clearly calls

25  out the specific reference information needed for Exhibit 8.

1    Q   But Exhibit No. 9 has different information than Exhibit

2    No. 8, correct?

3         MR. RAPHAEL:   Objection; mischaracterizes Exhibit 9.

4         THE COURT:   Overruled.

5         THE WITNESS:   The information should be the same, but

6    on Exhibit 8 you have links opposed to the actual e-mail

7    address.   So it's not going to be exact reference material.

8    BY MR. BORCIA:

9    Q   Well -- But it's different than that, isn't it, sir?

10         If you look -- Take, for example, Exhibit No. 8 -- Let

11    me ask this question first.

12         When -- Exhibit No. 9, when was that created?

13    A   This would have been on or before October of 2007.

14    Q   How do you know that?

15    A   My apologies.   I mean, we're talking about Exhibit 9 or we

16    were talking about Exhibit 8?

17    Q   Exhibit 9?

18    A   Exhibit 9 is the text version.   So my apologies, I don't

19    have the specific date of -- that date of that document.

20    Q   Well, we know it's different than Exhibit No. 8, don't we,

21    sir, because, for example, if you go to Exhibit No. 8, you will

22    see that it lists a number of states.   Do you see that?

23    A   Yes.

24    Q   And one of those states elicited in Exhibit No. 8 is the

25    state of Wisconsin.

1    A   Yes, sir.

2    Q   And are you saying there would have been a link on the site

3    to that state?

4    A   Yes, sir.

5    Q   Okay.  And but the link wasn't printed out for Wisconsin,

6    correct?  All we have here is the actual -- Correct.

7    A   Correct.

8    Q   Okay.  Now, let's go to Exhibit No. 9.  That has a number

9    of states listed on pages -- I guess it's page two -- starting

10   on page two of the document through the end of the document,

11   correct?

12   A   Correct.

13   Q   And you got -- You do not see Wisconsin listed, correct?

14   A   I do not.

15   Q   So these are different, correct?  Exhibit No. 9 is

16   different than Exhibit No. 8?

17   A   Correct.

18   Q   So let's finally go to Exhibit No. 10.  And this states

19   that Exhibit No. 10 is a printout of the earlier version of our

20   merchant support center section of our website posted on or

21   about October 24, 2007?

22   A   Yes, sir.

23   Q   Now, that document has a printout date of October 24, 2007,

24   correct?

25   A   Correct.

Q    And other than that date being printed on the page, do you

have any other way to verify as to when that was first posted?

A    No, sir.

Q    So when it says on or before October 24, 2007, it could

have been on that date or it could have been before that date;

but you can't tell us which one?

A    Correct.

MR. BORCIA:  Okay.  That's all I have, Judge.  Thank

you.

THE COURT:  All right.  Does the defense wish to be

heard further respecting this witness's ability to testify in

front of the jury?

MR. BORCIA:  Yes.

THE COURT:  All right.  Very briefly.

MR. BORCIA:  Well, I think in terms of the -- many of

the documents, I think in terms of how the -- part of the

problem is, the witness has talked to Ms. Sisic.  That would

be -- the foundation to that would be hearsay.

THE COURT:  He did not testify to any statements of

Ms. Sisic for the purpose of proving the truth of the matter

asserted; so that objection is overruled.  Go ahead.

MR. BORCIA:  I mean, certainly some of the things that

are in the affidavit are different than what he is saying.

So, I mean, my overall problem with it, Judge, is that

there -- and maybe this is just inherent with Mr. Wong's

1    affidavit -- that he can't testify to many of the things that

2    are in the affidavit in terms of any kind of relevance tie-up.

3          For example, the witness testified to the fact that he

4    can't tie these documents to Sogro make this entire line of

5    questioning irrelevant.

6          THE COURT:  Overruled.  That objection is overruled.

7    What's your next objection?

8          MR. BORCIA:  That's all I have.

9          THE COURT:  All right.  The witness will be allowed to

10   testify in front of the jury.  The Court is satisfied that he

11   has the requisite knowledge to testify as a record custodian on

12   behalf of Paymentech.

13         Now, the next question is how we will proceed with

14   respect to the examination of this witness.  I'd like to

15   inquire of the witness as to his availability to testify later

16   today, if necessary.

17         THE WITNESS:  Yes, I can be available.

18         THE COURT:  I ask because the jury is in the jury

19   room, and they're starving.  And I want to give them a chance

20   to have lunch.  And if that will -- If the witness will be

21   available, say, in one hour, we'll proceed in one hour with

22   your testimony in front of the jury.

23         Will you be available notwithstanding the weather

24   problem there?

25         THE WITNESS:  Yes, sir, I would.

1          THE COURT:  Excellent.  Thank you so much.

2          We will commence at –– Let's commence at quarter to

3     2:00; so we're –– in an hour and five minutes.

4          MR. RAPHAEL:  Can we –– Off the record right now.

5          (Discussion was held off the record.)

6          THE COURT:  We will commence in approximately an hour.

7     Thank you.  We will call back.

8          MS. VITALE:  Thank you so much.

9          THE BAILIFF:  All rise.

10         (A lunch recess was taken from 12:40 p.m. to 1:55

11    p.m.)

12         MR. RAPHAEL:  Your Honor, I'd like to call our next

13    witness, Mr. Boehm.

14         (The witness was first duly sworn under oath.)

15         THE CLERK:  Thank you.

16         THE COURT:  We have a frozen frame.  Mr. Boehm, can

17    you hear us?

18         THE WITNESS:  Yes, I can.  My understanding is that it

19    can freeze, but that it will come right back.

20         THE COURT:  One second.

21         THE CLERK:  Would you please state your full name and

22    spell your last name for the record.

23         THE WITNESS:  Yes, it's Robert Lee, and the last name

24    is Boehm, B-O-E-H-M.

25         THE CLERK:  Thank you.

1    THE COURT:  Please wait a moment while we try to clear

2  up this technical problem.

3    MR. RAPHAEL:  It says we're connected.  Are you -- Is

4  there issues with the storm or something or your Internet

5  connection on your side?

6    TEXAS REPORTER:  It says we're connected, but do you

7  want us to try and disconnect and reconnect again?

8    THE COURT:  Please do so.

9    TEXAS REPORTER:  Okay.  We will.

10    THE COURT:  The wonders of technology.  Perhaps you

11  now can better understand why we had some delays earlier.

12    MR. RAPHAEL:  Well, that and they're having a storm

13  down there.  Can we block the screens for a second while I --

14    THE COURT:  The jury screen is blocked.

15    MR. RAPHAEL:  There they are.  Hang on.

16    THE COURT:  All right.  Are we ready to proceed?

17    THE WITNESS:  Yes.

18    THE COURT:  Does the jury have an image?

19    (Yeses were heard from the jurors.)

20    MR. RAPHAEL:  Okay.

21    THE COURT:  Proceed.

22              D I R E C T   E X A M I N A T I O N

23  BY MR. RAPHAEL:

24  Q   All right.  So, Mr. Boehm, I know you already stated your

25  full name, where do you work right now?

1   A   I work for Paymentech, LLC.

2   Q   Okay.  And is that otherwise known as Chase Paymentech?

3   A   Yes, sir.

4   Q   All right.  And you're located down where?

5   A   In Dallas, Texas.

6   Q   Okay.  And that's the headquarters?

7   A   Yes, sir.

8   Q   And Chase Paymentech, do they have a web address?

9   A   Yes, they do.

10  Q   Is it ChasePaymentech.com?

11  A   Yes, sir, it is.

12  Q   Okay.  Give me a brief background on Chase Paymentech and

13  what they do.

14  A   Chase Paymentech is a merchant acquirer.  Essentially, we

15  process transactions, both credit and debit transactions on

16  behalf of merchants; and we process those transactions through

17  the card associations, Visa and MasterCard; and then ultimately

18  fund the merchant for their transactions.

19  Q   So the merchants are the people where we as consumers go

20  shopping with?

21  A   I'm sorry, can you repeat that question?

22  Q   I say the merchants, to put it in plain English, are the

23  businesses that consumers would go and buy things at or, in

24  this case hotels, that they would stay at?

25  A   Yes.  Correct.

1    Q    Okay.  And then the card associations that you mentioned,

2    Visa and MasterCard?

3    A    Visa, MasterCard, yes.

4    Q    And Discover, is that one, too?

5    A    Discover, AmEx.

6    Q    Okay.  Any others?

7    A    Those are the main card brands.

8    Q    Okay.  And so Paymentech does what on behalf of the

9    merchants like, for example, Sogro, Inc.?

10               MR. BORCIA:  Objection, Judge.

11               THE COURT:  One second.  What's the objection?

12               MR. BORCIA:  Scope, disclosure.  This is supposed to

13   be a records custodian.

14               THE COURT:  Overruled.

15   BY MR. RAPHAEL:

16   Q    You can answer, sir.

17   A    And can you restate the question?

18   Q    Yeah.  What is it -- What type of services is it that

19   Paymentech -- Chase Paymentech would do on behalf of merchants,

20   for example, like Sogro, Inc., in a general sense.

21   A    In a general sense, we would have an agreement with a

22   merchant to process their transactions.  They would accept

23   payments from consumers; and then through a terminal or PC

24   product or some avenue, they could transmit the information to

25   us, and then we would fund them, and we would provide

1    statementing to them.

2    Q    "Statementing to them," is that what you just said?

3    A    Statementing to the merchant.

4    Q    Okay.  And how long has Sogro, Inc. been a merchant

5    customer of Paymentech?

6    A    Since 1999.

7    Q    At Paymentech, what's your title there?

8    A    Group executive for client --

9    Q    Group executive for clients and --

10   A    Group executive and client support and implementations.

11   Q    Okay.  So when you're talking client support, "clients"

12   would mean the merchants like Sogro?

13   A    Correct.

14   Q    And implementations means what in plain English for them?

15   A    The on-boarding of merchant accounts.

16   Q    Okay.  All right.  So I'm going to go through --

17          THE COURT:  One second.  What do you mean when you say

18   "on-boarding"?

19          THE WITNESS:  On-boarding would be once a merchant

20   contacts a company like Chase Paymentech, we would receive a

21   merchant application; and we would go through the boarding

22   process.

23          So we would take that application, and we would build

24   the merchant records in order for us to be able to accept

25   payments and fund that particular merchant.  We refer to that

1    as the on-boarding process.

2              THE COURT:  Go ahead.

3    BY MR. RAPHAEL:

4    Q    Okay.  Is there anything else that's associated with the

5    on-boarding process besides what you just described?

6    A    The only additional item would -- not only building the

7    back-end records for that; and then we would make sure that we

8    provided the connectivity parameters for that merchant to be

9    able to contact processor transactions to us.

10   Q    All right.  So I'm going to have you look at some documents

11   that you brought with you today.

12             And the first one I'm going to have you look at is

13   what's been numbered 2538 from tab 14 or Exhibit 14.

14   A    Okay.

15   Q    Okay.  You have that in front of you?

16   A    Yes, sir.

17   Q    All right.  So can you tell me what this document is?

18   A    This document is a communication document that was used to

19   communicate to a specific group of merchants related to account

20   truncation.

21   Q    Okay.  Were you finished with your answer?

22   A    Yes, sir.

23   Q    Okay.  And when you say "account truncation," what does

24   that mean?

25   A    Account truncation on -- part over receipts.  It's the

1   ability to view either the full cardholder number or a

2   truncated number.

3   Q   So in plain English to only display the four digits of

4   cardholder's information on the receipt?

5              MR. BORCIA:  Objection; leading.

6              THE COURT:  Objection sustained.  Ask another

7   question, please.

8   BY MR. RAPHAEL:

9   Q   Could you please explain what you meant in more colloquial

10  jargon?

11  A   So as a consumer, if I go to a retail or any type of

12  business and I get a customer receipt, on that receipt my

13  cardholder -- my full cardholder number should not be visible

14  nor should my expiration date.

15  Q   Why?

16             MR. BORCIA:  Objection; scope, relevance.

17             THE COURT:  I will sustain the objection with regard

18  to scope.  Quite frankly, I'm sustaining on the basis of

19  foundation.

20             MR. RAPHAEL:  Okay.

21  BY MR. RAPHAEL:

22  Q   All right.  So this communication, document 2538, was sent

23  to a specific group of merchants that are clients of Paymentech

24  to communicate this information?

25             MR. BORCIA:  Objection; leading.

1          THE COURT:  Objection sustained.

2          MR. RAPHAEL:  Okay.

3   BY MR. RAPHAEL:

4   Q   I'm sorry.  Repeat then what --

5          THE COURT:  Ask a new question.

6          MR. RAPHAEL:  Okay.

7   BY MR. RAPHAEL:

8   Q   Document 2538, was this document created by Paymentech with

9   persons with knowledge of the information contained in the

10  document at or near the time the document was created?

11  A   Yes.

12  Q   Okay.  Is it a regular practice of Paymentech to have a

13  person who knew about the information contained in the document

14  create these types of the documents?

15  A   The experts would have been a part of the group create --

16  to help create the document; would not necessarily have been

17  the direct creator.

18  Q   Okay.  But the person with information would have created

19  the document?

20  A   They would have been a part of the discussions.

21  Q   Okay.  So these documents are created by multiple people at

22  Paymentech?

23  A   These documents would be created by a group of folks with

24  representation from our marketing group, our legal group, our

25  service teams, subject matter experts.

1  Q    And so that would be a regular practice of Paymentech to

2  have that group of people who knew about their various

3  component items of information that are now contained in that

4  document create that document, correct?

5  A    Correct.

6  Q    Okay.  And what was Paymentech's purpose for this

7  particular document, 2538?

8              MR. BORCIA:  Objection; scope.

9              MR. RAPHAEL:  It's a foundation question, Your Honor.

10             THE COURT:  I'll give you latitude.  Overruled.  Go

11  ahead.

12             MR. RAPHAEL:  Sorry.

13  BY MR. RAPHAEL:

14  Q    What was Paymentech's purpose for the creation of this

15  document?

16  A    The purpose of creating this document was to make sure we

17  communicated to our merchant base about the upcoming changes

18  with account truncation.

19  Q    Okay.  Previously, you said a specific group of merchants.

20  What did you mean by a specific group of merchants?

21  A    For this particular communication, we identified merchants

22  that had terminal devices that appeared to be old in nature

23  that possibly were suspect of not account truncating the

24  cardholder number; and so this communication was specific to

25  those merchants that were identified.

1    Q    Okay.  And was Sogro, Inc. a merchant with such a device?

2    A    I do not have knowledge of that.

3    Q    If I gave you the type of device that was used by Sogro,

4    Inc., would you know if that was the category of merchant to

5    which --

6                   MR. BORCIA:  Objection; scope.

7                   MR. RAPHAEL:  -- this document would have been sent?

8                   MR. BORCIA:  Objection; scope.  This goes far beyond

9    the affidavit.

10                   THE COURT:  Objection overruled.  Again, I'm going to

11   give the -- this party latitude because it appears to be

12   foundational.

13                   MR. BORCIA:  I need an offer on this, Judge.

14                   THE COURT:  All right.  Sidebar.  Off the record.  As

15   far as the witness is concerned, we'll be taking this at

16   sidebar.  You'll hear a lot of scratchy noise.

17                   (A sidebar was held.)

18                   (The following proceedings were held at sidebar.)

19                   THE COURT:  One second.

20                   MR. BORCIA:  This is the very issue I addressed with

21   the Court earlier.  This witness was not disclosed in discovery

22   or in the pretrial order.  Your Honor has allowed the witness

23   to testify to the specific items in the affidavit presented by

24   the witness.  In the affidavit of Mr. Wong, it states -- it

25   states -- it states that certain merchants were sent this

1 information.  There was no indication from Mr. Wong that Sogro

2 was one of those merchants.

3     In fact, I examined Mr. Boehm before this testimony,

4 and he said he could not identify that.  Now the Court is

5 allowing this counsel to go beyond the affidavit and basically

6 remedy a defect or something not in the affidavit, that is, to

7 tie up whether or not Sogro is one of the merchants not

8 contained in the affidavit.

9     This is not fair.  It's surprising.  It's not properly

10 disclosed, and it's not foundational.  The foundation for this

11 goes to the issue of --

12     THE COURT:  All right.

13     MR. RAPHAEL:  Simply put, number one, I'm not trying

14 to do anything other than lay the foundation.  These are direct

15 foundation questions out of a treatise as to what you ask to

16 establish foundation of the document.

17     I can't help that opposing counsel asked the questions

18 in the way that he asked them to pre-impeach the witness.  If

19 you would have asked him the next remarkable question of what

20 group of merchants was this sent to, he would have discovered

21 that this was sent to that group of merchants.

22     It's not a surprise since it was an affidavit saying

23 that these are the documents that were transmitted in the

24 regular course of business to those merchants like Sogro.

25     MR. BORCIA:  The issue I have, Judge --

1          THE COURT:  I'm going to change my ruling.  I'm going
2     to sustain the objection.
3          MR. RAPHAEL:  I just need to understand, so I don't --
4          THE COURT:  You asked a question of the witness
5     respecting whether or not Sogro, if --
6          You indicated that you were going to inquire whether
7     Sogro was one of the merchants who had a terminal that may be
8     problematic and thereby an attempt to lay a foundation for
9     something else.  That was objected to.  I made a ruling.  I'm
10    reversing my ruling --
11         MR. RAPHAEL:  Yes.
12         THE COURT:  -- regarding the inquiries of Sogro's
13    terminal.
14         MR. RAPHAEL:  But I can continue asking foundation for
15    the document?
16         THE COURT:  You can continue examining the witness.  I
17    don't know what else you want to do with respect to this
18    witness.
19         MR. RAPHAEL:  Okay.
20         (The following proceedings were held in the presence
21    of the jurors.)
22         THE COURT:  The Court has sustained the objection of
23    the defense, and another question will be asked of the witness.
24         Mr. Raphael, you have to move things along, please.
25         MR. RAPHAEL:  Sorry, I was skipping some questions.

BY MR. RAPHAEL:

Q   What was the method used by Paymentech to create and maintain the document 2538?

A   2538 --

Q   Uh-huh.

A   -- is a document that is stored locally within a specific project folder, and this project folder contained this document.

Q   Okay.  And when you said that the purpose of the document was to be sent to customer -- merchant customers of Paymentech with older devices, how do you know that?

A   I personally was part of the project team at that time.

Q   Okay.  And what would an older device have been defined as?

        MR. BORCIA:  Objection; scope.

        THE COURT:  Sustained.

BY MR. RAPHAEL:

Q   In what manner could we identify how document 2538 was used with regard to the Paymentech client base in the regular course of its business?

A   My apologies, can you restate --

        THE COURT:  Rephrase.

BY MR. RAPHAEL:

Q   Okay.  Was it -- It was the regular practice for Paymentech to use the document 2538 to communicate the information in the document with certain merchant clients of Paymentech, correct?

1          MR. BORCIA:  Objection; leading.

2          THE COURT:  Sustained.

3     BY MR. RAPHAEL:

4     Q    What was the purpose, again, for the use of 2538?

5          MR. BORCIA:  Objection; asked and answered.

6          THE COURT:  Sustained.

7     BY MR. RAPHAEL:

8     Q    Could you clarify how you determine -- how --

9          Could you clarify how this document was used in

10    communicating with Paymentech's merchant clients?

11    A    In a general sense, we communicated to clients based on

12    terminal types that we believed possibly were not truncating

13    cardholder information or expiration dates.

14    Q    And that was done in the regular course of regularly

15    conducted business activity by Paymentech?

16    A    For this particular project, yes.

17    Q    Okay.  And what, for this particular project that this

18    particular document was used, what grouping of point-of-service

19    terminals was this document regularly used for in Paymentech's

20    business activity?

21         MR. BORCIA:  Objection; scope, asked and answered.

22         THE COURT:  Sustained with regard to scope.

23         MR. RAPHAEL:  All right.  Well, I would move to have

24    exhibit -- or document 2538 moved into evidence.

25         MR. BORCIA:  Objection; relevance.

1    THE COURT:  Overruled.  It's received.

2    MR. RAPHAEL:  Okay.  I'm going to show members of the

3  jury the document.  I'm sorry, I'm blocking out the witness's

4  face at the moment.  I'll try and do some sort of a split

5  screen.

6  BY MR. RAPHAEL:

7  Q   Okay.  Now, looking at this document, can you go through

8  the information on it, please, and identify the items of

9  information that were intended to be communicated to Paymentech

10  merchant clients?

11    MR. BORCIA:  Objection; scope.

12    THE COURT:  Sustained.

13    MR. RAPHAEL:  All right.  I will let the document then

14  speak for itself.

15    THE COURT:  No editorial comment is warranted.  And,

16  again, members of the jury, the statements of the lawyers are

17  not evidence.

18    Ask another question of the witness, please.

19  BY MR. RAPHAEL:

20  Q   When was this document created?

21  A   March of 2004.

22  Q   And was it the regular course of Paymentech's business to

23  transmit these documents to its merchant clients at that point

24  in time or shortly thereafter?

25    MR. BORCIA:  Objection; asked and answered.

1          THE COURT:  Sustained.

2    BY MR. RAPHAEL:

3    Q    Okay.  I'm going to move on to another document.  I'd like

4    you to look at 2540, okay.

5          Do you recognize that document?

6    A    Yes, I'm looking at that document.

7    Q    Okay.  And can you identify what that document is?

8    A    It's very similar to the first exhibit with the exception

9    of not having a box around the bottom section.

10   Q    Okay.  And what was the purpose for Paymentech to create

11   this document?

12   A    A general purpose would be the same as the first exhibit.

13   Q    Okay.  Are the answers that you gave with regard to the

14   first exhibit going to be the same as it relates to the second

15   exhibit?

16   A    Yes, sir.

17         MR. RAPHAEL:  Okay.  I move to have the second exhibit

18   entered into evidence.

19         THE COURT:  Any objection?

20         MR. BORCIA:  Same objection.

21         THE COURT:  Overruled.  It's received.

22   BY MR. RAPHAEL:

23   Q    I'm going to show the members of the jury document 2540.

24         And in terms of differences between 2540 and 2538,

25   could you again describe what you were stating previously now

1    that people can see it?

2    A    The bottom section under action required, that is visible

3    and it is not outlined.

4    Q    So you're -- If you're looking at it, then where it says

5    bold, action required if your terminal prints the full card

6    number and ending in four digits of cardholder number, no

7    action is necessary on your part, that's what you're referring

8    to?

9    A    Yes, sir.

10   Q    On the prior exhibit it's the same language, but it's got

11   some sort of gray box around it?

12   A    That's correct.

13   Q    Okay.  Any other differences between the two documents?

14   A    Generally, they're the same document.

15   Q    And they were used for the same purpose?

16   A    Correct.

17   Q    All right.  I'm going to have you look at document 2542.

18             Can you identify that document?

19   A    This document is an industry wire.

20   Q    Okay.  And from -- And when was this document created?

21   A    This document was created in September of 2004.

22   Q    Okay.  And was it Paymentech's regular practice to create

23   this document in its regularly conducted business activities?

24   A    Yes, sir.

25   Q    Okay.  What was the purpose for this document that -- or

1    what was the --

2           What was the purpose for this document that Paymentech

3    created the document and used it in its regularly conducted

4    business activities for?

5    A    The general purpose, again, was to create a document and

6    provide specific information related to compliance changes or

7    card brand changes.

8    Q    Okay.  And so was this document sent to its merchant

9    clients at or around the time that this document was created?

10   A    Yes, sir.

11   Q    Okay.  And that was in September of 2004?

12   A    Yes, sir.

13   Q    Okay.  Was it sent to all Paymentech client merchants or

14   certain client merchants?

15   A    This document was created for the audience of all

16   merchants.

17   Q    Okay.  And how was it sent in the regular course of

18   regularly conducted activity by Paymentech?

19   A    The general practice at that time was to send these

20   documents via e-mail or, I'm sorry, via regular mail.

21   Q    So it was the regular practice of Paymentech at that point

22   back in September of 2004 to mail this type of document to all

23   Paymentech merchant clients?

24   A    Correct.

25           MR. RAPHAEL:  All right.  And I move to have entered

1    into evidence document 2542.

2            MR. BORCIA:  No objection.

3            THE COURT:  Received.

4            MR. RAPHAEL:  Okay.  Hang on a second.  We may have

5    these out of order.  Could you block the -- Thank you.  Sorry,

6    Your Honor, in my desire to create a more pristine version of

7    documents, I might have deleted this one from the group.  Just

8    one second.

9            THE COURT:  Use your hard copy.

10           MR. RAPHAEL:  I won't be able to display it on the

11   screen.  I've got it here.

12           THE COURT:  With a hard copy you can use the Elmo with

13   the display device next to the window with the camera up in the

14   air or, alternatively, you can put it on the witness stand, and

15   we can show the picture from above the witness stand.

16           MR. RAPHAEL:  That's fine, Your Honor.  I actually

17   have it up now.

18   BY MR. RAPHAEL:

19   Q    Okay.  So if we unblock the screen, it's there.  All right.

20           So at the top of 2542, that's the Paymentech industry

21   wire?

22   A    Correct.

23   Q    All right.  First issue, volume one; and how many pages is

24   this document?

25   A    Two pages.

1    Q    Okay.  And on your copy are you able to see the information

2    under summary of card company requirements?

3    A    I am not.

4    Q    Okay.  Do you know what information was contained in there

5    in the originals?

6    A    In a general sense.  I mean, the heading states what the

7    general topic is, but I wouldn't have specific knowledge of

8    what's behind the grayed-in boxes.

9    Q    Let's move to the second page of the document which is

10   2543.  What are the headings there?

11   A    I'm sorry, what was the question?

12   Q    Can you see the headings on that?

13   A    I can.

14   Q    All right.  So the second -- The middle heading is account

15   number truncation suppression requirement nears?

16   A    Correct.

17   Q    Okay.  And what did that have to do with?

18   A    Again, account truncation and the need to get in front --

19   get information in front of our clients.

20   Q    Blowing it up here.  Okay.

21          So this -- This information here would have been out

22   in advance of the actual compliance statement?

23   A    Correct.

24   Q    Okay.  I want to move to document 2548, and can you

25   identify that document for me?

A    2548 --

Q    Yeah.

A    -- is a specific targeted communication.

Q    Okay.  What do you mean "a specific targeted
communication"?

A    Meaning, the intent was for a specific merchant that was
part of a proactive call-out campaign related to account
truncation.

Q    Okay.  And what was -- What was the purpose of this
document in the account call-out campaign you're discussing?

A    For situations where three attempts had been tried in order
to reach the merchant.  The letter was created so that you can
follow-up via mail with the same information that was -- that
they were calling about.

Q    Okay.  And so what -- What does this version of that
document represent in terms of Paymentech's document?

        MR. BORCIA:  I don't understand the question, Judge.

        THE COURT:  Did you understand the question as asked?

        THE WITNESS:  No, I did not.

        MR. RAPHAEL:  Okay.

BY MR. RAPHAEL:

Q    Let me see here.  What was the purpose behind creating this
particular document, 2548?

A    This document was created specifically for a service team
that conducted the outbound call campaign related to account

1    truncation.

2    Q    Okay.  What does this document have to do with the

3    Paymentech merchant client of Sogro, Inc.?

4    A    This document is not tied to Sogro.

5    Q    When you say -- It's not tied to Sogro?

6    A    It's not directly associated with Sogro.

7    Q    Well, it's a template; so it wouldn't be directly tied with

8    anyone.

9            THE COURT:  One second.  Counsel, you cannot testify.

10           MR. RAPHAEL:  Okay.

11           THE COURT:  Rephrase.

12   BY MR. RAPHAEL:

13   Q    This is a template, correct?

14   A    That is correct.

15   Q    It's not directly tied to any particular --

16           THE COURT:  Is it --

17   BY MR. RAPHAEL:

18   Q    I'm sorry.  Is this document tied to any particular

19   merchant client?

20   A    This particular document is a template.  It is not tied to

21   any specific merchants.

22   Q    Okay.  Then how does it tie to merchants in the use of this

23   document in its ordinary and regularly conducted business

24   activities of Paymentech?

25           THE COURT:  Rephrase, please.

BY MR. RAPHAEL:

Q    Yeah.  How does this template --

How does this template get used in Paymentech's

regular --

THE COURT:  Sidebar, please.

(A sidebar was held off the record.)

(The following proceedings were held in the presence

of the jurors.)

THE COURT:  Please be advised that we're going to take

a very short break.  I'd like the witness to stand by.  We will

keep the line open.  And if you can mute your mic, that would

certainly be helpful; but the jury is going to go back to the

jury room for a couple of moments.  And we'll resume as quickly

as we can.

(A recess was taken from 2:38 p.m. to 2:51 p.m.)

(The following proceedings were held in the presence

of the jurors.)

THE COURT:  Plaintiff may proceed.

MS. KRUMHORN:  Mr. Boehm, I'm Allison Krumhorn.  I'm

going to be finishing up your testimony.

D I R E C T   E X A M I N A T I O N (continued)

BY MS. KRUMHORN:

Q    So could I take you back to page 2548.

A    Yes, ma'am.

Q    Okay.  What group of merchants did Paymentech send this to

1  in its regularly conducted business activity?

2  A   This letter was a follow-up to merchants that were part of

3  the proactive call campaign related to account truncation.

4  Q   Could you please describe that group.

5          MR. BORCIA:  Objection to scope.

6          THE COURT:  Overruled.

7          THE WITNESS:  Can you restate question, please?

8  BY MS. KRUMHORN:

9  Q   Yes.  Which -- What group?

10 A   Group of merchants?

11 Q   Yes.

12 A   Merchants that, again, were target -- or identified as

13 potentially having terminals that possibly were not truncating

14 the full cardholder number would have been part of that

15 outbound call campaign.

16 Q   Describe the group of merchants that this was used to

17 describe the identity.

18          MR. BORCIA:  Objection; scope.

19          THE COURT:  Do you understand the question?

20          THE WITNESS:  I believe the question to be a repeat --

21          THE COURT:  Okay.  If you understand -- Do you

22 understand what was asked?

23          THE WITNESS:  Yes.

24          THE COURT:  All right.  Before you respond, the

25 objection is overruled.  Proceed.

```
1          MR. BORCIA:  And objection; asked and answered.

2          THE COURT:  Overruled.  You may respond to the

3    question if you can recall it.

4          THE WITNESS:  It would be better to have the question

5    restated.

6          THE COURT:  All right.  I thought so.  Go ahead.

7    BY MS. KRUMHORN:

8    Q    Please describe the criteria used to identify the group.

9    A    The merchants that were identified as having a piece of

10   equipment likely to not truncate cardholder information would

11   have been identified for this outbound call campaign.

12   Q    Which equipment are you referring to?

13         MR. BORCIA:  Objection; scope.

14         THE COURT:  Overruled.

15         THE WITNESS:  I do not have that information.

16   BY MS. KRUMHORN:

17   A    Okay.  Was it the regular practice and regular course of

18   business for Paymentech to transmit copies of these

19   documents --

20         Was it the regular practice and regular course of

21   business of Paymentech to transmit copies of these documents to

22   Paymentech merchant customers like Sogro?

23         MR. BORCIA:  Objection; leading.

24         THE COURT:  Overruled.

25         MS. KRUMHORN:  I would like to --
```

1      THE COURT:  There was no response to the question.

2    BY MS. KRUMHORN:

3      THE COURT:  Did you understand the question as asked?

4      THE WITNESS:  Yes, I understood the question.

5      THE COURT:  Can you respond to the question?

6      THE WITNESS:  For this particular project, an outbound

7    call campaign, the intent was to communicate this letter to

8    merchants after three call attempts had been attempted.

9      MS. KRUMHORN:  I would ask now to move this document

10   into evidence, document 2548.

11     MR. BORCIA:  Objection; relevance.

12     THE COURT:  Overruled.

13   BY MS. KRUMHORN:

14   Q   Next, please look at document 2550.

15   A   I have 2550.

16   Q   Okay.  What is this document?

17   A   This document is a part of our website talking about

18   account number truncation rules.

19   Q   And when was this created?

20   A   On or before April of 2008.

21   Q   Is it the regular practice of Paymentech to create and

22   maintain documents like this?

23   A   Yes.

24   Q   Is this document routinely created by persons --

25     Is this document routinely created by persons with

1    knowledge of the information contained in the document at or

2    near the time the document was created?

3    A    Yes.

4    Q    And what was the purpose of this document?

5    A    The purpose of having information on our website is to make

6    sure we have consistent messaging with -- communicating to our

7    clients as well as what is on our website.

8    Q    Was it the regular course of business for Paymentech to

9    transmit copies of these -- to have this on the website?

10   A    Yes.

11           MS. KRUMHORN:  I would like to move document 2550 into

12   evidence.

13           MR. BORCIA:  Objection; relevance.

14           THE COURT:  Overruled.  Received.

15   BY MS. KRUMHORN:

16   Q    The next document I would like you to look at, please, is

17   2552.

18   A    I have 2552.

19   Q    What is this document?

20   A    This document is a -- frequently asked questions related to

21   account truncation.

22   Q    Is it the regular practice of Paymentech to create and

23   maintain a document like this?

24   A    Yes.

25   Q    Are these documents routinely created by persons with

1    knowledge of information contained in the documents at

2    or near --

3              THE COURT:  Are you asking about these documents or

4    this particular document?

5              MS. KRUMHORN:  This particular document.  Document --

6    To be specific 2552 -- 2552 which then goes to 2553, one line.

7              THE WITNESS:  Can you restate the question, please?

8    BY MS. KRUMHORN:

9    Q    Is this document routinely created by persons with

10   knowledge of the information contained in the document at or

11   near the time the document was created?

12   A    Yes.

13   Q    When was this document created?

14   A    This document is from our website.

15   Q    Uh-huh.

16   A    And dates back to 2008.

17   Q    How long was it --

18             THE COURT:  Repeat your answer.

19             THE WITNESS:  This document is related to a web page,

20   and the way this record was -- dates back to 2008.

21   BY MS. KRUMHORN:

22   Q    What was the earliest record?

23   A    I do not have that information.

24   Q    What was the web address for this record?

25   A    Paymentech.com.

1    Q    What was purpose of this document -- website?

2    A    This document, in addition to the last exhibit we reviewed,

3    was to help provide answers to frequently asked questions

4    relating to account truncation.

5    Q    Was it the regular practice for Paymentech to transmit

6    copies -- to post these on the website?

7    A    To post these on the website, correct.

8              MS. KRUMHORN:  I move now to -- I would like to move

9    documents 2552 and 2553 into evidence.

10             MR. BORCIA:  Objection; relevance.

11             THE COURT:  Objection overruled.  It's received.  I

12   should say both are received.

13   BY MS. KRUMHORN:

14   Q    Okay.  The next document is 2555 going to 2556.

15   A    I have 2555 and 2556.

16   Q    What is this document?

17   A    This document is an earlier version of Exhibit 6.

18   Q    Okay.  Is the regular practice of Paymentech to create and

19   maintain a document of this type?

20             THE COURT:  Are you asking by "a document of this

21   type" or this particular document?

22             MS. KRUMHORN:  This particular document.  I apologize,

23   Your Honor.

24             THE WITNESS:  Yes.

25   BY MS. KRUMHORN:

1    Q    Okay.  Is this document routinely created by persons with

2    knowledge of the information contained in the document at or

3    near at the time it was created?

4    A    Yes.

5    Q    What was Paymentech's purpose for these documents -- for

6    this document?

7    A    The general purpose was to make sure we were communicating

8    to our clients the impact of upcoming changes for this one

9    specific -- to account number truncation rules.

10   Q    So I'm looking -- If you go to 25 -- At the bottom of 2555

11   and the bottom of 2556 --

12   A    Yes.

13   Q    -- it just lists all the states that you -- that you had

14   said that are Paymentech representatives as having some sort of

15   truncation requirements.

16   A    Correct.

17   Q    Okay.  And what was the purpose of this document other than

18   what I just stated?

19   A    Just the awareness.

20   Q    Okay.  Okay.  Was it the regular practice of Paymentech to

21   transmit -- to post these on their website?

22        Was it the regular practice of Paymentech to post this

23   document on the website?

24        THE COURT:  Would you respond again, please.

25        THE WITNESS:  Yes.

1          MS. KRUMHORN:  I now request that we move document

2    2555 and 2556 into evidence.

3          MR. BORCIA:  No objection.

4          THE COURT:  Received.

5    BY MS. KRUMHORN:

6    Q   So I'm going to take you to the bottom, again, of 2555 and

7    the top of 2556.

8    A   Yes, ma'am.

9    Q   You have a listing of all the states?

10   A   The states -- The list of states is complete as of this

11   particular posting on the website.

12   Q   Okay.  And according to the document, again, why are these

13   states listed here?

14   A   Each state could have different rules or different dates of

15   compliance.

16   Q   Okay.  Okay.  Did each state -- These states, these are all

17   links; and so it would take them to where -- to the applicable

18   law if I'm correct?

19   A   Correct.

20   Q   Okay.  And is Wisconsin listed?

21   A   Yes, it is.

22   Q   Okay.  Where is Wisconsin listed?

23   A   On document 002556.

24   Q   Okay.  Okay.  I'm going to -- Please look at documents 2552

25   and 2553.

1   A    Okay.

2   Q    Please identify the document you brought -- Please identify

3   what this is.

4   A    On 2552?

5   Q    Yeah, 2552, 2553.

6   A    Again, this is the frequently asked questions related to

7   account truncation posted on our website.

8   Q    And when was this created?

9        MR. BORCIA:  Judge, we've been through this.  This is

10  already in evidence.

11       MR. RAPHAEL:  No, that's the second document.  This

12  is --

13       MS. KRUMHORN:  This is a different one.

14       MR. BORCIA:  He's been through 2552 and 2553.  It's in

15  evidence.

16       MR. RAPHAEL:  Oh, I'm sorry.

17       MS. KRUMHORN:  Okay.

18       THE COURT:  Yes.

19  BY MS. KRUMHORN:

20  Q    2558, 2559, 2660 -- or 2560 and 2561.

21  A    I have those documents.

22  Q    Okay.  What is this document?

23  A    This document is a text version of an earlier version of

24  the last exhibit.

25  Q    Okay.  So this was on the website?

1   A   This is the text version of an earlier version of Exhibit

2   8.

3   Q   Okay.  Is it the regular practice of Paymentech to create

4   and maintain a document of this type?

5   A   Yes.

6   Q   Okay.

7           THE COURT:  Let's clarify something.  The witness just

8   referred to Exhibit 8.  Is Exhibit 8 a subpart of Exhibit 14

9   that you're looking at?

10          MR. RAPHAEL:  Yes.

11          THE COURT:  I'm asking the witness.

12          MR. RAPHAEL:  I'm sorry.

13          THE COURT:  Is Exhibit 8 a subpart of the overall

14  exhibit that you have in front of you?

15          THE WITNESS:  Yes.

16          THE COURT:  All right.  Go ahead.

17  BY MS. KRUMHORN:

18  Q   It is the regular practice of Paymentech to create and

19  maintain a document like this?

20  A   Yes.

21  Q   Is this document routinely created by persons with

22  knowledge of information contained in the document at or near

23  the time the document is created?

24  A   Yes.

25          MS. KRUMHORN:  I would now ask to move documents 2558

and 2559 through 2560, 2561 into evidence.

THE COURT: Any objection?

MR. BORCIA: None.

THE COURT: They're received.

BY MS. KRUMHORN:

Q Okay. I'm now -- If you can, I guess, also put document 2555 and 2556 next to you, as well.

A Okay.

Q What are the differences between these documents?

MR. RAPHAEL: One minute, Your Honor. I'm going to split screen it.

THE COURT: One moment, please.

BY MS. KRUMHORN:

Q What are the differences between these two documents?

A These documents -- Exhibit 9 is the text version. Exhibit 8 is a different version. It's specifically what was posted. They're similar but would call out -- as updates --

As updates were needed, then updates would have been made, right.

Q Which one was the earlier version?

A Exhibit 9 is an earlier version of Exhibit 8.

THE COURT: Would you please state the page number of Exhibit 9 that you're referring to.

THE WITNESS: 2558 through 2561 is a text version of an earlier version of Exhibit 8. Page number 00255 (sic) and

1    2556.

2    BY MS. KRUMHORN:

3    Q    Okay.  I now ask that you look at documents 2563 and 2564.

4    A    Okay, I have these documents.

5    Q    Please identify this document.

6    A    Within our website there's a merchant support center

7    outlining different topics of interest that our merchants might

8    want to have more information specifically calling out account

9    truncation, among other topics.

10   Q    Is it the regular practice of Paymentech to create and

11   maintain this type of page?

12   A    Correct.

13   Q    And what was the purpose for this web page?

14   A    General awareness about multiple topics.

15   Q    What topics?

16   A    Multiple topics.

17   Q    Was it the regular practice in the course of business for

18   Paymentech to post these on their website?

19   A    Yes.

20        MS. KRUMHORN:  I now ask to move documents 2563 and

21   2564 into evidence.

22        THE COURT:  Objection?

23        MR. BORCIA:  No objection, Judge.

24        THE COURT:  2563 and 2564 are received.

25   BY MS. KRUMHORN:

1    Q    Okay.  In the portion of the web page that says card

2    association alerts; and then there's, you know, various things

3    listed underneath, are those links?

4    A    Can you state the documents you're referring to?

5    Q    Yes, I'm sorry, 2563 in the middle of the page.

6    A    Under card association alerts?

7    Q    Yes.

8    A    Those would be quick links to specific information.

9    Q    Okay.  And then if you go a little down the page, there is

10   a heading that says account truncation.

11   A    Yes.

12   Q    And below that are those links?

13   A    Yes.

14   Q    And do you know what those are links to?

15   A    I do not have that information.

16          MS. KRUMHORN:  Okay.  I have no further questions.

17          THE COURT:  Mr. Borcia.

18          MR. BORCIA:  Thank you, Judge.  Can we have the screen

19   transferred to me?

20                  C R O S S - E X A M I N A T I O N

21   BY MR. BORCIA:

22   Q    Good afternoon, sir.

23   A    Good afternoon.

24   Q    I have some follow-up questions for you, Mr. Boehm.

25          When was the first time you ever heard of Sogro?

1    A    In this particular case; not before.

2    Q    And when you say "in this particular case," give us some

3    time frame for that.

4    A    Within the last two weeks.

5    Q    Before the last two weeks, you had never heard of Sogro?

6    A    I have not.

7    Q    Now, I'm going to go through some follow-up questions on

8    the exhibits that counsel asked you about, and I apologize if

9    some of this is going over things you've already gone over

10   somewhat.  I'll try to keep it brief.

11             If we can turn back to Exhibit 2538.

12   A    I have 2538.

13             MR. BORCIA:  Judge, if we can have the screen moved to

14   my left so I can show the jury.

15             THE COURT:  I'm not certain that can be done.

16             MR. RAPHAEL:  I'm moving to 2538 for you.

17             MR. BORCIA:  All right.  Can you move it up a little

18   bit?

19             MR. RAPHAEL:  Like this?

20             MR. BORCIA:  Yeah, that's fine.

21   BY MR. BORCIA:

22   Q    So counsel asked you some questions about this document.

23             Do you recall those questions?

24   A    I mean, generally, yes.

25   Q    So the first question I have is, is this a Paymentech

1    document?

2    A    It is.

3    Q    And does it have the name Paymentech on it?

4    A    I do not see Paymentech here.

5    Q    So, in fact, the word Paymentech is not on the document?

6    A    Correct.

7    Q    Now, you have no knowledge to state that this document was

8    ever sent to Sogro, correct?

9    A    Correct.

10   Q    Going to Exhibit 2540, I'll ask you again, on this document

11   you have no basis to say that this document, 2540, was ever

12   sent to Sogro?

13   A    Correct.

14            MR. BORCIA:  Can we move 2540 up next.

15            MR. RAPHAEL:  I'm sorry.

16   BY MR. BORCIA:

17   Q    Now, going to document 2542 that counsel -- Are you there?

18   A    I'm here.

19   Q    Okay.

20            MR. RAPHAEL:  Wait.

21   BY MR. BORCIA:

22   Q    Now, the first question I have is, this document itself,

23   when was it created?

24   A    This document was created in September of 2004.

25   Q    Okay.  And was that after the FACTA statute was passed?

1    A   I do not have that date in front of me.

2    Q   Is there any reference to FACTA in this document?

3    A   In my copy I do not have the full contents of this

4 document.

5    Q   Well, in the content that you do have, is there any

6 reference of FACTA?

7    A   I do not see reference to that.

8    Q   Let's go to page two of this document.

9            MR. RAPHAEL:  Specifically, Counsel, 25 --

10           MR. BORCIA:  2543.

11 BY MR. BORCIA:

12    Q   There's a reference if you go under the -- If you can blow

13 that up -- Under account number truncation suppression

14 requirements, do you see that?

15    A   I do see that.

16    Q   That's talking about the nearing requirements for Visa and

17 MasterCard, correct?

18    A   Correct.

19    Q   It doesn't talk about the nearing requirements for FACTA,

20 does it?

21    A   I do not see that information in there.

22    Q   In fact, the next paragraph talks about and states, it's

23 easy to determine if your terminals and devices are compliant.

24        If they are, only the last four digits of the

25 cardholder's account number will print.  Do you see that?

1  A    Yes.

2  Q    Okay.  Now, the requirement of the last four digits, that's

3  not a FACTA requirement, is it?

4         MR. RAPHAEL:  Objection; form and foundation.

5         THE COURT:  I'll sustain the foundation question.

6  BY MR. BORCIA:

7  Q    Are you aware of what FACTA's requirements are?

8  A    I am not.

9  Q    So you're not aware of what FACTA required in terms of

10 credit card receipts?

11 A    No, sir.

12 Q    When did you begin working for Paymentech?

13 A    In 1994.

14 Q    Now, going back to Exhibit 2542, again, I'll ask you this

15 question with respect to this document, you have no basis to

16 state that this document was ever sent to Sogro?

17 A    Correct.

18 Q    Let's go to document 2548.

19        MR. BORCIA:  Would you put that on the screen, please.

20        MR. RAPHAEL:  It's five --

21 BY MR. BORCIA:

22 Q    Are you there, sir?

23 A    Yes.

24 Q    Now, I think you said earlier that this document was a

25 template?

1    A    Correct.

2    Q    And I think you also told counsel that this document was

3    not tied to Sogro.

4    A    This document was not tied to any merchant specifically.

5    Q    Okay.  Including Sogro?

6    A    Including Sogro.

7    Q    And I'll ask you about this document.  You have no basis to

8    state that this document was ever sent to Sogro?

9    A    Correct.

10   Q    When I say "this document," I just don't mean the template.

11   I mean, you have no basis to say the actual document if the

12   address had been filled in was ever sent to Sogro, correct?

13   A    That's correct.

14   Q    Now, there's reference here to -- in this document to phone

15   calls being made on August 15, 2004; August 20, 2004; and

16   August 25, 2004.  Do you see that?

17   A    I do.

18   Q    Now, that is just documents or phone calls listed in the

19   template, correct?

20   A    Correct.

21   Q    And you have no basis to state that Sogro was ever called

22   by Paymentech, correct?

23   A    Correct.

24   Q    Let's go to 2550.  Now, you made a statement, as counsel

25   asked you in this document --

1      MR. BORCIA:  If we can get to that, Counsel.  Do you

2    have 2550?

3    BY MR. BORCIA:

4    Q    Counsel asked you the question of when this document was

5    created.  Do you recall that?

6    A    I do.

7    Q    And -- Bless you.  I thought you said April of 2008 or

8    before.  Maybe I misunderstood your testimony.

9          Do you recall what date it was created?

10   A    I said on or before April of 2008.

11   Q    Now, the copyright symbol listing in this document says

12   2010.  Do you see that?

13   A    That's correct.

14   Q    All right.  So it's possible this document was not created

15   before April 2008?

16   A    This document was printed in 2010.

17   Q    Correct.  And my question is, in terms of when the document

18   was first -- wait.  When I say a document here, this is a

19   printout of a website?

20   A    Correct.

21   Q    Okay.  So can we call it just a web printout?

22   A    Correct.

23   Q    Okay.  So the web printout -- You said it was printed in

24   2010.  I think your testimony is, it would have been created

25   sometime on or before April of 2008, correct?

1    A    That's correct.

2    Q    Now, you have no records to show that it was actually

3    created before April of 2008, correct?

4    A    There's evidence on archive.org that shows this particular

5    information out there or very similar information as of April

6    of 2008.

7    Q    And there's no information that you've seen on archive.org

8    or anywhere else that would have shown this information or

9    information like it before April of 2008?

10   A    No, sir.

11   Q    Correct?

12   A    Correct.

13   Q    Now, if we can go to Exhibit 2552 and '3.  Would you give

14   the same answers in terms of the dates of this document as the

15   prior document?

16   A    Yes, sir.

17   Q    Again, this document is talking about truncation

18   requirements of the credit card companies?

19   A    Correct.  Although, on 2550 there's reference to FACTA.

20   Q    On 2550, okay.  All right.  Let's go back to that for a

21   second.

22        2550, it doesn't state on there what FACTA required,

23   correct?

24   A    Correct.

25   Q    Let's go forward.  And counsel asked you some questions

1    about --

2            MR. RAPHAEL:  Wait, are we talking about -- Were you

3    just asking him about --

4            THE COURT:  One second.  One second, Counsel.  Please

5    do not interrupt and ask a question of opposing counsel.

6            If you have something you want to raise, address it to

7    the bench.

8            MR. RAPHAEL:  Your Honor, I object to that last

9    question and answer as incorrect to both of them.

10           THE COURT:  Well, at this time your associate is the

11   one who's handling the witness.  If she wishes to raise an

12   objection, I'll listen to it.

13   BY MR. BORCIA:

14   Q   Now, counsel asked you some questions about --

15           THE COURT:  He's withdrawing the question.  Ask

16   another question, please.

17           MR. BORCIA:  I am.

18   BY MR. BORCIA:

19   Q   2558 through 2564 --

20   A   Yes, sir.

21   Q   I want to make sure I understand -- I'm not a techno guy --

22   I think you said this was a text version of what was previously

23   in Exhibit No. 8.

24   A   It's a text version of an earlier version of Exhibit 8

25   specifically is how it was stated on the affidavit.

1    Q    Now, Exhibit 8, if you go back to that, that was a web

2    printout, correct?

3                MR. RAPHAEL:  Am I going --

4                MR. BORCIA:  Exhibit 8, 2555.

5                MR. RAPHAEL:  Okay.

6                THE WITNESS:  That's correct.

7    BY MR. BORCIA:

8    Q    So what you're saying is, 2558 is a text version of a web

9    page?

10   A    It's a text version of a web page earlier than Exhibit 8.

11   Q    Okay.  If we can go to 2558, Counsel.  All right.

12               So now when you say it's a text version of an earlier

13   version, do you know when this document was created?

14   A    I do not.

15   Q    Is there any indication on the document that would refresh

16   your memory in terms of when it could have been created?

17   A    No, sir.

18   Q    Well, let's go to the first page.  There's a statement that

19   says under the paragraph, in addition -- looks like it's the

20   second full paragraph under the heading -- In addition, Visa

21   and MasterCard have also set deadlines for compliance among

22   businesses.

23               Visa requires that all terminals deployed after

24   June -- July 1st, 2003 be in compliance by July 1st, 2003.  Do

25   you see that indication?

1  A   Yes, sir.

2  Q   Okay.  So now this document, again, is talking about what

3  the credit card companies are requiring, Visa and MasterCard,

4  correct?

5  A   Correct.

6  Q   And it's also talking about what the states are requiring

7  in terms of truncation?

8  A   Yes.

9  Q   Okay.  Now, in this document, you actually specify -- and

10 this would have been, again, on the website, correct, at some

11 point in time?

12 A   The content, yes.

13 Q   Now, you specify for your member -- By the way, let me ask

14 this question first.

15      The website itself, was that accessible to the public?

16 A   Yes, sir.

17 Q   So you do not have to be a member to access the website?

18 A   Correct.

19 Q   Then you have listed here -- On the website you listed all

20 the states that had legislation passed requiring truncation?

21      MR. RAPHAEL:  Objection; foundation.

22      THE COURT:  Overruled.

23 BY MR. BORCIA:

24 Q   Is that correct, sir?

25 A   The state -- The information that was available at the time

1    that this text was created would have been current.

2    Q   What you specify is two different dates for each state,

3    correct?

4    A   Correct.

5    Q   You specified -- Can you tell the jury what those dates

6    were, the two dates under each state?  Starting with the first

7    date.  Why don't you start under Arkansas.

8    A   Right.  So the date is 2003.  It's talking about the year

9    referencing the information about state, year, bill, number,

10   new terminal deadline, and existing terminal deadline.

11   Q   Okay.  So if we -- Maybe Arkansas is a bad example.  Let's

12   go to Arizona.  It's got two different dates.  It's got June 1,

13   2002 and January 1, 2004.  What do those two dates mean?

14   A   Terminal deadline of June 1, 2002 and existing terminal

15   deadline of January 1, 2004.

16   Q   I didn't understand.  The first one you said -- I didn't

17   catch your answer.  I'm sorry.

18   A   In reference to June 1st?

19   Q   Yes.  Sorry.

20   A   That's new terminal deadline.

21   Q   What does that mean, "new terminal deadline"?

22   A   This would reference new terminals being deployed.

23   Q   So if I'm buying a new terminal or getting a new terminal

24   for Paymentech, that's the deal I've got to comply with,

25   June 1st, 2002?

1    A    Correct.

2    Q    And the second date is you said existing terminal deadline?

3    A    Correct.

4    Q    So if I already have a Paymentech terminal, that's when I

5    have to comply, January 1st, 2004?

6    A    Correct.

7    Q    Now, is it fair to say that this document would have been

8    created on or after the dates of the legislation referenced

9    here?

10         MR. RAPHAEL:  Objection; form, foundation.

11         THE COURT:  Objection sustained.

12   BY MR. BORCIA:

13   Q    Well, let me ask you this, sir.

14         Please tell this jury in this document where there's

15   any reference to the state of Wisconsin having requirements for

16   truncation.

17   A    I do not see reference to Wisconsin.

18   Q    Let's go to page 2561.  And if you -- If Wisconsin were on

19   there, you would expect to see it on that page after the state

20   of Washington, correct?

21   A    Correct.

22         MR. BORCIA:  That's all I have.  Thank you.

23         THE COURT:  Is there any redirect?

24         MS. KRUMHORN:  Yes.

25              R E D I R E C T   E X A M I N A T I O N

1    BY MS. KRUMHORN:

2    Q    If you could look at documents 2538 and 2540.

3              THE COURT:  Would you please move the documents to the

4    side or pull it down.

5              MR. RAPHAEL:  Can we take a two-minute pause, Your

6    Honor?

7              THE COURT:  What's the reason?

8              MR. RAPHAEL:  I just want to convey my notes.

9              THE COURT:  Proceed.

10             MR. RAPHAEL:  Okay.

11   BY MS. KRUMHORN:

12   Q    You had testified that these documents were sent to a

13   specific group of merchants that would likely not be compliant

14   with FACTA, documents 2538 and 2540?

15   A    I testified that merchants that were not -- did not have

16   cardholder account truncation would have been targeted for this

17   communication.

18   Q    Okay.  And you don't know -- You can't say that Sogro was

19   not sent these documents, correct?

20   A    No, I cannot.

21   Q    Okay.  Did you look at Paymentech business records for

22   Sogro before appearing today?

23   A    Only briefly during a screen share with the customer

24   service manager.

25   Q    Okay.  Would they have fit in the criteria of the merchants

1    that were sent documents 2538 and 2540?

2              MR. BORCIA:  Objection; scope.

3              THE COURT:  Sustained.

4    BY MS. KRUMHORN:

5    Q    When you looked at their file, what information did you

6    see, the Sogro file?

7    A    It was general information just to confirm their merchant

8    number.

9    Q    Okay.  Could you tell by looking at the merchant number

10   whether they were sent these documents, documents 2538 and

11   documents 2540?

12   A    No, I could not.

13   Q    Okay.

14             MS. KRUMHORN:  That's -- I have no further questions.

15             MR. BORCIA:  No further, Judge.  Thank you.

16             THE COURT:  Does the jury have questions of the

17   witness?  Please stand by.  Please approach.

18             (A sidebar was held.)

19             (The following proceedings were held at sidebar.)

20             THE COURT:  The attorneys are looking at the jury's

21   questions at this time.

22             Do the plaintiffs have objections to any one or more

23   of the questions?  Does the plaintiff have objections to any

24   one or more of the questions?

25             MS. KRUMHORN:  No, Your Honor.

1    THE COURT: Does the defense?

2    MR. BORCIA: Yes. These questions are outside of the

3 scope of the affidavit. They go into areas such as how was it

4 even delivered to the merchant, what type of equipment --

5 what's the history of the models. This goes beyond whatever

6 the affidavit says; beyond the scope and beyond the affidavit.

7    MR. RAPHAEL: Respectfully, Your Honor, defense

8 counsel opened up the doors on almost all of this when he

9 started asking the witness about his knowledge.

10    THE COURT: Ms. Krumhorn should be raising these

11 issues.

12    MS. KRUMHORN: Mr. Borcia opened the door to all these

13 issues by asking the witness knew what FACTA was. And all of

14 this -- He went outside the scope of the documents to asking

15 his personal knowledge regarding matters.

16    THE COURT: But it doesn't -- I'm not clear as to

17 whether or not the witness was asked anything concerning, for

18 example, the delivery of 2548 to the merchant.

19    MR. BORCIA: It's outside Mr. Wong's affidavit.

20    THE COURT: I'm going to sustain the defense

21 objections.

22    (The following proceedings were held in the presence

23 of the jurors.)

24    THE COURT: Members of the jury, the Court has

25 concluded these questions will not be asked. The witness is

1    therefore excused.

2          Thank you very much for your time this afternoon.

3          THE WITNESS:  All right.  Thank you.

4          THE COURT:  That will terminate the connection.

5          Who will be the next witness?

6          MS. KRUMHORN:  Trisha Pugal.

7          (The witness was first duly sworn under oath.)

8          THE CLERK:  Please state your full name for the record

9    and spell your last name.

10         THE WITNESS:  Trisha Pugal.  Last name is spelled P as

11   in Peter, U-G-A-L.

12         THE CLERK:  Thank you.

13         MR. RAPHAEL:  Sorry, Your Honor, we're just switching

14   gears on the exhibits.

15               D I R E C T   E X A M I N A T I O N

16   BY MR. RAPHAEL:

17   Q   Good afternoon.  Your name is Trisha Pugal?

18   A   Pugal.

19   Q   Pugal.  I'm sorry if I mispronounced it before.

20         Can you tell me where you work?

21   A   Sure.  I work at the Wisconsin Hotel and Lodging

22   Association, formally the Wisconsin Innkeepers Association.

23   Q   What is that organization?

24   A   Representing the lodging industry around the state, over

25   700 members, property members.

1    Q    Okay.  And what's the purpose behind the association?

2    A    Marketing, education, government representation, resources,

3    legal assistance, et cetera.

4    Q    Okay.  When you say "education," what type of education do

5    you provide members with?

6    A    A variety of information that comes out that relates to the

7    industry timely and, in general, for operations, to planning,

8    to general business practices.

9    Q    Would those general business practices include accepting

10   credit cards for payment for lodging?

11   A    As it relates to lodging properties, sure.

12   Q    Okay.  And you also said part of the organization also

13   consists -- it provides legal representation of some sort?

14   A    Yes.  They have access to our counsel for specific

15   situations.

16   Q    Okay.  And is that access free or at charge or what?

17   A    It is free with limitations.

18   Q    Okay.  So members are able to consult with these lawyers on

19   an as-needed basis for questions?

20   A    Limited situations.

21   Q    Okay.  And give me a for instance of what kind of limited

22   situations we're talking about.

23   A    I'm talking primarily frequency or if you need something in

24   writing, et cetera.  It's more consult.

25   Q    Uh-huh.  Okay.  So nothing that would involve, you know,

1    serious litigation; but you could go to them to ask procedural

2    or legal questions?

3    A   Basic questions, correct.

4    Q   All right.  And then as part of the education aspect of the

5    association, do you guys put out a -- I guess I'd call it a

6    newspaper or magazine called In Touch?

7    A   Yes.

8    Q   And what is that?  Describe it for me.

9    A   It's a quarterly publication just for members; and it has

10   different news, some articles, association information, et

11   cetera.

12   Q   Okay.  And is that mailed to all of your membership?

13   A   It is mailed to -- Yes, I believe we have some different

14   kinds of members that are not included in that mailing list;

15   but all of our lodging members do get a copy.

16   Q   Would Sogro, Inc. be one of the lodging members that was

17   with the group?

18   A   At what time?

19   Q   I'm sorry, between 2004 and 2008.

20   A   Yes.

21   Q   Okay.  So they've ceased becoming -- They've ceased being a

22   member?

23   A   The property is the member, and -- The lodging property

24   itself is the member not the individual.

25   Q   Oh, okay.

1   A   So the property was no longer a member after 2010.

2   Q   Okay.  Prior to that, how far back were they a member?

3   A   I believe it was 1973 or 1978.

4   Q   Okay.

5   A   It was a long time.

6   Q   All right.  So they would have received and be sent these

7   In Touch quarterly -- What do you call them?  Magazines?

8   A   A magazine.

9   Q   The quarterly In Touch magazine would have been sent to

10  them?

11  A   It would have been mailed to them, correct.

12  Q   How long had In Touch been in business, I guess?  Or how

13  long have you had the publication In Touch?

14  A   Before my time.  I've been around 20 years.

15  Q   Oh, okay.  So -- Great.  So let me take you to some select

16  pages.

17          I'm going to show you on your screen page 32 and 34 of

18  the Court's Exhibit 26 -- I'm sorry 3234 and 3235.

19          Can you see those?

20  A   I can see the screen.

21  Q   Is it showing up on the screen?

22  A   I can see the screen, yes.

23  Q   So you see those documents?

24  A   Yes.

25  Q   Okay.  Can you tell me what those documents are?

1    A    It's an article on technology.  And I'm not sure if it's

2    part of the representation that we had sent over.  Do you have

3    the page number on that?

4    Q    Here, if you scroll down, do you see that this is a section

5    of --

6    A    Sixty-seven through 78, okay.

7    Q    I'm sorry, ma'am.  You can't be looking at your own

8    documents.  I'm directing you to look at --

9    A    I was going to match it because that's what I looked at

10   before.

11            THE COURT:  All right.  Go ahead.

12   BY MR. RAPHAEL:

13   Q    Go ahead and match it then.

14   A    Okay.

15   Q    Okay.  So I'm looking -- I want you to look at -- On the

16   screen, do you see page 3234 on the screen?

17   A    I can see the screen.  I'm not sure -- 3234 or where those

18   numbers are coming from.

19   Q    If you look at --

20            THE COURT:  Pull up the bottom of the screen.

21   BY MR. RAPHAEL:

22   Q    At the bottom of the screen.

23   A    I don't think I have a full screen.

24   Q    Let me see.

25   A    My screen shows about three-quarters of it; not the whole

1    page.  Okay.  So I can see then -- Okay.  Okay.

2    Q   Do you see that number there?

3    A   Yes, I do.

4    Q   Okay.  Looking at 3234, do you see that this document is

5    page seven of the summer 2005 In Touch magazine?

6    A   Yes.

7    Q   Okay.  All right.  And if you look at page 3235, do you see

8    the bottom of the screen?

9    A   Yes.

10   Q   You can see that's page 15 of the same --

11              THE COURT:  One second, Counsel.  You cannot testify.

12   You have to proceed --

13              MR. RAPHAEL:  I'm sorry.

14              THE COURT:  -- using a different format.  This is not

15   a deposition.

16   BY MR. RAPHAEL:

17   Q   Looking at page 3235, can you identify what this document

18   is?

19   A   That's also from the In Touch magazine.

20   Q   From what issue?

21   A   Summer 2005.

22   Q   Okay.  What page?

23   A   It's page 15 in our issue.

24   Q   Right.  Okay.

25              MR. RAPHAEL:  So I'd move to have this entered into

1    evidence.

2              THE COURT:  Is there an objection?

3              MR. BORCIA:  Relevance.

4              THE COURT:  Do you wish to be heard at sidebar,

5    Counsel?

6              MR. BORCIA:  Yes.

7              THE COURT:  All right.

8              (A sidebar was held.)

9              (The following proceedings were held at sidebar.)

10             MR. BORCIA:  Again, the document is -- document is

11   partly -- a portion of a newsletter or a magazine that starts,

12   I guess, on page seven.  I'm not sure what else is -- Nothing

13   else has been produced.  Page seven on the bottom, then we go

14   to page 15.

15             So this is, again, part of another document never

16   introduced in the case.  The document has not been established

17   it was received by Sogro.  The document has no reference to

18   FACTA.  I have no idea what the relevance of this document is.

19             MR. RAPHAEL:  First off, now we're getting

20   problematic.  Counsel is saying that this has never been

21   received or filed with this case, and on the actual document we

22   can see that it is a document that has been submitted to the

23   Court as early as April.

24             MR. BORCIA:  What I said was --

25             THE COURT:  Let him finish.  Let him finish.  Go

1    ahead, Mr. Raphael.

2         MR. RAPHAEL:  All right.  It was attached to this

3    witness's affidavit previously; plus, in Mr. Solus's deposition

4    on -- Mr. Solus -- Question:  Okay, let me ask you this.

5    You've been handed what's been marked as Exhibit 22, which is

6    excerpts from In Touch summer 2005.  Answer:  In Touch from

7    Wisconsin Innkeepers Association?  Question:  That's what it

8    looks like on the top left there.  Answer:  Yeah.  Question:

9    It says WIA.  Did you get the In Touch magazine as of the

10   summer -- as of summer of 2005?  Answer:  I believe so.

11        THE COURT:  Objection is overruled.

12        (The following proceedings were held in the presence

13   of the jurors.

14        THE COURT:  The objection overruled.  Proceed.

15        MR. RAPHAEL:  Actually, I'm going to go back here.

16        THE COURT:  Overruled.

17   BY MR. RAPHAEL:

18   Q   Okay.  So now I'd ask that the screen of this be unblocked

19   so that the witnesses (sic) can see, and I move to have this --

20        THE COURT:  The screen will not be unblocked at this

21   time.

22        MR. RAPHAEL:  Oh, I thought I had moved to have

23   this --

24        I move to have document 3234 and 3235 entered into

25   evidence.

```
1              THE COURT:  Again, is there an objection beyond what

2    we've discussed already?

3              MR. BORCIA:  No, Your Honor.

4              THE COURT:  They're received.

5              MR. RAPHAEL:  Now, I'd ask that the jury be given

6    access to the view the document.  Not on my end or my end?

7              THE COURT:  No, it's not on yours.  Can the jury see

8    their screens?

9              (Yeses were heard from the jurors.)

10   BY MR. RAPHAEL:

11   Q   So I'm blowing this up for you so that you can see what the

12   jury is seeing.  You can see at the top of the screen the WIA.

13   That stands for --

14             THE COURT:  One second.  You cannot explain things,

15   Counsel.  Let the witness explain.

16   BY MR. RAPHAEL:

17   Q   Can you explain to me what the WIA is at the top?

18   A   Wisconsin Innkeepers Association.  That was our name at the

19   time of this publication.

20   Q   This particular publication was published and mailed to

21   your membership when?

22   A   Summer of 2005.

23   Q   And in this particular article, what was the purpose behind

24   sending this article to your membership?

25   A   We publish articles that may be of interest to our members.
```

1    Q    Okay.  Why would this one be of interest to your members?

2              MR. BORCIA:  Objection; foundation.

3              THE COURT:  Objection sustained.

4    BY MR. RAPHAEL:

5    Q    Who would have been involved in selecting this article for

6    publication in summer of 2005?

7    A    The editor usually looks at different opportunities that

8    are out there that would have information that our members

9    might be interested in.

10   Q    Okay.  Then this article in the In Touch magazine would

11   have been mailed to Sogro, Inc. then, correct?

12   A    It's part of the magazine that was mailed to them.

13   Q    Now, I want you to look at -- if we can block the jury, I'm

14   going to do a couple more of these.

15             I'd like you to look at 3236.  On your screen, do you

16   see that?  Do you see that document there?

17   A    Yes.  I'm trying to -- It keeps moving on me, so I'm

18   trying --

19   Q    Sorry.  I'm trying to move it so you can see it.

20   A    Okay.  Yes, I see that.

21   Q    Okay.  Do you recognize this document?

22   A    Yes.

23   Q    And where does this document come from?

24   A    This comes from the winter 2006 In Touch magazine.

25   Q    And specifically what page?

1    A    It is on page four.

2    Q    Okay.  And I'm just going to do the rest of these in

3    sequence before I get into them any further.

4              I'm going to have you look at 3237.  Do you recognize

5    that document there on the screen?

6    A    Yes.

7    Q    Okay.  Where does that document come from?

8    A    Winter 2008 In Touch magazine.

9    Q    What page?

10   A    Page nine.

11   Q    Okay.  And then the next document is 3241 right there.

12             Do you recognize that document?

13   A    Yes.

14   Q    Okay.  And that is from where?

15   A    Winter 2008 In Touch magazine.

16   Q    What page?

17   A    Page 14.

18   Q    And then the next page, same thing?

19   A    Winter 2008 In Touch magazine, page 15.

20   Q    Okay.  That's page 3242 on the screen?

21   A    Yes.

22             MR. RAPHAEL:  Okay.  So I'd move to have these

23   documents entered into evidence.

24             THE COURT:  Objection?

25             MR. BORCIA:  I think we -- What documents are we

1    talking about?

2              THE COURT:  3236, 3237, 3241 and 3242.

3              MR. BORCIA:  Yes, there's an objection on relevance.

4              THE COURT:  Objection overruled.  They're received.

5    BY MR. RAPHAEL:

6    Q    Going to 3236.  I'd like to put this up on the screen.

7    Okay.

8    A    Yes.

9    Q    The shaded part -- The shaded part in the upper left-hand

10   corner of page 3236, can you tell me what that is?

11   A    That's an article that -- It's a clip of an article that we

12   thought would be of interest to our members.

13   Q    What's the article about?

14   A    The title says, important credit card merchants must comply

15   with, security standards.

16   Q    And do you know what standards it's talking about?

17   A    I would rather let the document speak for itself.  I did

18   not write it.

19   Q    Do you know what the standards are that it's talking about?

20   A    Yes.

21   Q    What?

22   A    PCI.

23   Q    And what is that?

24   A    Payment card industry data security standards.

25   Q    Okay.  Do you know if that also includes truncation of

1   credit card numbers?

2          MR. BORCIA:  Objection; foundation.

3          THE COURT:  Sustained.

4          MR. RAPHAEL:  Withdrawn.

5   BY MR. RAPHAEL:

6   Q   And I see here in the middle column at the top there's a

7   link.  What is that to?

8   A   It's to a securitymetrics.com summary article.

9   Q   Okay.  Is this document, besides it being mailed, available

10  on the Internet?

11  A   No.  At this time it was not.

12  Q   Okay.  And at that time, you mean winter of 2006?

13  A   Correct.

14  Q   All right.  Going to the next page here, this is the -- oh,

15  I'm sorry, I thought it was -- apologize.  I was confused about

16  what this was.

17         3237, this is -- Can you identify what this is again

18  for the jury?

19  A   Can you scroll down so I can see the number at the bottom?

20  Q   Oh, yeah, yeah.  I'm sorry.

21  A   And the question?

22  Q   Yeah.  What's this document?

23  A   This is an article in our winter of 2008 In Touch magazine.

24  Q   Okay.  And -- Okay.  What does this pertain to?

25  A   The title of the article is PCI mandates, safeguard your

1    customers in your business.  That's the title.

2    Q    When you say, "safeguard your customers in your business,"

3    what does -- what does that entail?

4    A    I would let the article stand for itself.  I did not write

5    it.

6    Q    Let me go to the next page of the article, 3241.

7          Do you see where -- do you see at the top -- Can you

8    tell me if this --

9    A    I'm sorry, the question?

10   Q    Can you tell me if this is the continuation of the article?

11   A    Yes.

12   Q    Okay.  And in this article -- in this section of the

13   article, do you see reference to any rules or regulations in

14   there?

15   A    I'm sorry.  Again, I would let the article speak for

16   itself.  I did not write it.

17   Q    Okay.  And going to the last page, 342, is that a

18   continuation of the same article?

19   A    Yes.

20   Q    Okay.  And do you see the section about additional

21   compliance requirements?

22   A    I can see that heading.

23   Q    Okay.  Do you see reference to the Fair and Accurate Credit

24   Transactions Act, FACTA?

25   A    I would let the article speak for itself.

1    Q    But do you see that section?

2    A    Entitled what again?

3    Q    Where it says, additional compliance requirements, the

4    middle of the page that's highlighted.

5    A    Yes.

6    Q    All right.  Are you familiar what FACTA is or FACT Act is?

7    A    I am not personally educated in that, no.

8    Q    Have you heard of it before?

9            THE COURT:  The Court is going to limit your

10   examination of this witness respecting this subject.

11           Ask another question, please.

12   BY MR. RAPHAEL:

13   Q    All right.  When would this paper have been sent out?

14   A    Winter 2008.

15           MR. RAPHAEL:  Nothing further.

16           THE COURT:  Cross.

17           MR. BORCIA:  Yes, Your Honor.  Thank you.

18               C R O S S - E X A M I N A T I O N

19   BY MR. BORCIA:

20   Q    Good afternoon, ma'am.

21   A    Good afternoon.

22   Q    I just have some follow-up for you.  If we can first --

23           Let me ask you this question first.  You were talking

24   about your members in your association, and you said that these

25   publications are mailed to the members; is that correct?

1    A    Correct.

2    Q    During a certain period of time?

3    A    Correct.

4    Q    Now, you don't track whether your members actually received

5    any publications, do you?

6    A    No.  If they're returned, they're returned; but, no, we

7    don't -- we don't track them.

8    Q    You don't track whether or not your members actually read

9    the publications?

10   A    We can't, no.

11   Q    And you don't require your members to read the

12   publications?

13   A    No.

14   Q    Correct?

15   A    Correct.

16   Q    So the member can receive your publication, put it on their

17   desk, and leave it set there and not read it; and there's no

18   issue with your membership, correct?

19   A    Correct.

20   Q    You have no knowledge in this case that Mr. Solus --

21            THE COURT:  Please --

22   BY MR. BORCIA:

23   Q    -- Mr. Solus or anyone in Sogro read any of these

24   publications?

25   A    Correct.

1    Q    Now, what counsel has shown you in this case is not the

2    actual publications, correct?

3    A    Correct.  Well --

4    Q    What he has shown you are excerpts of the publications,

5    correct?

6    A    Correct.

7    Q    Excepts that he selected, correct?

8              MR. RAPHAEL:  Objection; relevance.

9              THE COURT:  Regardless, overruled.

10             THE WITNESS:  Which I provided when required.

11   BY MR. BORCIA:

12   Q    Let's go to the first document that was put into evidence

13   with you, which I think is Document No. 3224.

14             Do you recall that document?

15   A    Yes.

16   Q    Now, that article that you refer to by itself was not sent

17   to any of the members by itself?

18   A    Correct.

19   Q    So this was sent in a publication, and the article appeared

20   in the publication?

21   A    Correct.

22   Q    And counsel had chosen not to put in the entire

23   publication?

24             MR. RAPHAEL:  Objection.

25             THE COURT:  Overruled.

1       THE WITNESS:  So I should answer it?

2       MR. BORCIA:  Yes.

3       THE WITNESS:  Correct.

4   BY MR. BORCIA:

5   Q    Now, what was on the cover of the publication?

6   A    Offhand, I don't remember.

7   Q    So you don't know if the cover of the publication had any

8   information about credit cards?

9   A    I would have to look.

10  Q    But that was not part of the document?

11  A    Correct.

12  Q    In fact, what we have is -- The first thing that counsel

13  has shown you is page seven?

14  A    Correct.

15  Q    So pages one through six, what are those pages?

16  A    We have them back at the office.  I don't know them

17  offhand.

18  Q    But that's -- But your members would have received the

19  entire publication, correct?

20  A    Correct.

21  Q    Okay.  So -- now -- And there was nothing on the cover that

22  you know of that would have highlighted the cover that said,

23  alert, look at article on page seven?

24      MR. RAPHAEL:  Objection; foundation.

25      THE COURT:  Overruled.

1          THE WITNESS:  Without checking, I couldn't answer

2     that.

3     BY MR. BORCIA:

4     Q    Now, you were asked -- You were subpoenaed for documents in

5     this case by counsel, correct?

6     A    Correct.

7     Q    What counsel subpoenaed you for were documents relating to

8     credit card issues, correct?

9     A    Correct.

10    Q    And you produced all the documents responsive to that

11    subpoena?

12    A    If that's a question, then correct.

13    Q    And you didn't produce the cover of this particular

14    publication, did you?

15    A    No.

16    Q    So is it fair to say that based upon that, the cover didn't

17    reference credit cards?

18         THE COURT:  Counsel, let me just indicate something to

19    you and to the jury.  Whether something is fair is relative.

20    The real question is whether or not it's accurate.  So please

21    re-craft your question.

22         MR. BORCIA:  Sure, Judge.

23         THE COURT:  It's one of my hangups.  A lot of lawyers

24    ask the question that way, and it's one of my hangups.

25         MR. BORCIA:  I understand, Judge.

1   BY MR. BORCIA:

2   Q  But it would be accurate to say that based upon that

3   request for information that if pages one through six would

4   have had credit card information, you would have produced it?

5   A  Yes.

6   Q  Now, let's go to page seven of the publication.

7         Now, I know you said you'd defer to the author.  You

8   didn't author the article, correct?

9   A  Correct.

10   Q  But the author is Pat Miller, editor of the Texas Hotel and

11   Lodging Association.  Do you see that?

12   A  Yes.  Yes, it's provided by another association.  We had

13   permission to reprint.

14   Q  Okay.  And what were the -- Did you know what the Texas

15   rules were on credit cards as opposed to Wisconsin?

16   A  When we publish from another state, we make sure that it's

17   relevant within our state.

18   Q  Okay.  Well, in this particular page, there's no reference

19   to FACTA, is there?

20   A  I'm sorry.

21   Q  There's no reference to FACTA in this article?

22   A  I'm not sure I understand.

23   Q  Well, counsel asked you questions about FACTA, the Fair and

24   Accurate Credit --

25   A  I'm sorry, yes.

1    Q    There's no reference to FACTA in this article?

2              MR. RAPHAEL:  Objection.

3              THE COURT:  What is the objection?

4              MR. RAPHAEL:  Mischaracterizes the document.

5              THE COURT:  Overruled.  Is there any other objection?

6              MR. RAPHAEL:  Foundation.

7              THE COURT:  Objection sustained.

8              MR. BORCIA:  The document is in evidence.

9              THE COURT:  Objection sustained.

10   BY MR. BORCIA:

11   Q    Do you see the words FACTA --

12             THE COURT:  Let me just state the reason for

13   sustaining the objection.  It's asking the witness to make a --

14   to state a legal conclusion.

15   BY MR. BORCIA:

16   Q    Do you see the word FACTA on the page?

17   A    I have a hard time reading this document.  I'm trying to

18   find the hard cover because the numbers are all different.

19   Q    I can help you out.

20             MR. BORCIA:  May I approach, Your Honor?

21             THE WITNESS:  I just need the page number from this

22   packet.

23   BY MR. BORCIA:

24   Q    Boy, I don't know.  Let me give you my copy, ma'am.  That's

25   the page.

1    A    Sixty-six.

2    Q    Does that help you?

3    A    That helps me.  I can find it now.  And your question

4    again?

5    Q    Do you see the word FACTA on that page at all?

6    A    I do not.

7    Q    Do you see the word truncation?

8    A    It's going to take me a little longer here.

9    Q    Do you know what, we'll skip it.  I don't want to waste

10   more time.  We'll just move on.

11        The next document that counsel asked you about was

12   document 3236.  And do you have that document in front of you?

13   A    We have different numbering systems.  I'm trying to catch

14   up.

15        MR. BORCIA:  Can I approach?

16        THE WITNESS:  All I need are the page numbers down

17   here.

18   BY MR. BORCIA:

19   Q    That page is down here.  Sixty-eight.

20   A    Sixty-eight, okay.

21   Q    So your page 68 will be our page 3236?

22   A    Okay.

23   Q    Now, again, this is an article from the magazine, correct?

24   A    Correct.

25   Q    This is -- Again, the excerpt is not the entire magazine?

1    A    Correct.

2    Q    And this starts on page four.  And all that is produced

3    from this magazine are pages four and nine?

4    A    Correct.

5    Q    And the same questions I asked you before about the prior

6    magazine in terms of the publication being a broader-based,

7    that would be the same for this document?

8    A    Yes.

9    Q    Now, you said that this document was sent in the winter of

10   '06, or it's the winter of '06 edition?

11   A    Correct.

12   Q    Now, there's no reference to FACTA in this document?

13              MR. RAPHAEL:  Objection; foundation.

14              THE COURT:  Objection sustained.

15   BY MR. BORCIA:

16   Q    Do you see the word FACTA on that page?

17   A    I do not.

18   Q    Do you see the words Fair and Accurate Credit Transactions

19   Act on that page?

20   A    I do not.

21   Q    Now, would those answers also be the same for the next page

22   in the article, which is page nine?

23              MR. RAPHAEL:  Bates number?

24   BY MR. BORCIA:

25   Q    3237.

1    A    To clarify, you're asking for the same two words?

2    Q    You know what, I'm going to withdraw those questions.  I

3    will move on.

4              Now, counsel referred you to the winter of '08 edition

5    of the magazine which would have been in document, for you,

6    starting on your page 68.  So this is document -- our 3236, but

7    he referred you to, in that magazine, 3242; and your page would

8    be, looks like, 76.

9    A    Which one am I going to?

10   Q    3242.  I think you're on page 76, ma'am.

11   A    Okay.

12   Q    Do you recall that being asked about that page?

13   A    Yes.

14   Q    Okay.

15   A    I didn't hear a question.

16   Q    That's fine.  So -- Now, I think you said this was the

17   winter of '08 edition?

18   A    Correct.

19   Q    Now, it states in here that FACTA requires

20   machine-generated debit and credit card receipts printed after

21   December 4, 2006.  Do you see that?

22   A    I see that.

23   Q    Now, is this winter of 2008 reference to FACTA, is that the

24   first reference to FACTA in any of your publications?

25              MR. RAPHAEL:  Objection; foundation.

1          THE COURT:  Overruled.

2          MR. RAPHAEL:  Sidebar.

3          THE COURT:  Overruled.

4          THE WITNESS:  I have provided, to the best of my

5     knowledge, all of the articles and information pieces that we

6     published relating to this topic.

7          MR. BORCIA:  That's all I have.  Thank you.

8          THE COURT:  Redirect.

9          MR. RAPHAEL:  Yes.

10              R E D I R E C T   E X A M I N A T I O N

11    BY MR. RAPHAEL:

12    Q   I'm going to have you look at 3234.  And if you look on the

13    screen, it's fine.

14         Do you know when you were asked in the subpoena to

15    produce this along with the other records that was -- that were

16    produced by your organization in this case?

17    A   In 2009.

18    Q   Okay.  And when you produced those documents, you produced

19    them not only to us but to opposing counsel, correct?

20    A   I submitted them wherever I was asked to submit them.

21    Q   But the subpoena that you responded to was also sent to

22    opposing counsel, counsel for Sogro.  Do you recall?  Do you

23    have a copy of subpoena?

24    A   Yeah, I probably do in here somewhere.

25    Q   The reason I ask is when --

```
 1                THE COURT:  Let her finish.

 2                THE WITNESS:  I have a copy of this.  And your

 3      question is, did it -- who did it get sent to?  Is that it?

 4                MR. RAPHAEL:  Actually, let me see what it is so that

 5      I --

 6                THE WITNESS:  6/19 --

 7                THE COURT:  Approach.

 8                THE WITNESS:  I mean, this is what you sent.

 9                MR. RAPHAEL:  I have a copy.  One second, Your Honor.

10      Okay.

11      BY MR. RAPHAEL:

12      Q    I'm going to have you look at a document --

13                THE COURT:  If you wish her to look at a document, it

14      must be marked for the trial record and identified by a trial

15      exhibit number.

16                MR. RAPHAEL:  A moment, Your Honor.  Sidebar on the

17      mechanics of it.

18                THE COURT:  Approach.

19                (A sidebar was held.)

20                (The following proceedings were held at sidebar.)

21                THE COURT:  We're now on the record.

22                MR. RAPHAEL:  I don't have a physical copy of the

23      notice of subpoena that was sent out.  I just have it on our

24      computer.  I can print it later.

25                THE COURT:  You can print it later?
```

1          MR. RAPHAEL:  Any problems with me --

2          THE COURT:  Proceed.  I have blanked the jury's

3   screen.

4          MR. RAPHAEL:  That's fine.

5          (The following proceedings were held in the presence

6   of the jurors.)

7          THE COURT:  Okay.

8   BY MR. RAPHAEL:

9   Q   So I'm going to show you on the screen a notice of subpoena

10  that we can mark as an exhibit at a later --

11         THE COURT:  It should be identified now as Exhibit 32

12  for identification.

13         MR. RAPHAEL:  All right.  So we'll mark this as

14  Exhibit 32 for identification purposes.  It's a two-page

15  document.

16  BY MR. RAPHAEL:

17  Q   And can you identify this document for me?

18  A   I do not recall seeing this document, but I can identify

19  that this says it's a notice of subpoena.

20         MR. BORCIA:  Objection.  Object to the foundation if

21  she can't -- has not seen the document.

22         THE COURT:  Objection sustained.

23  BY MR. RAPHAEL:

24  Q   Do you have in your possession a partial copy of the

25  subpoena to which you originally answered?

1    A    I have the one dated 6/19/2009.  It doesn't look like that.

2    Q    Do you see the date on the certificate of service for this

3    document?

4            THE COURT:  One second.  Exhibit 32 she has not

5    identified.  Ask another question unrelated to this particular

6    document.

7            MR. RAPHAEL:  Okay.

8    BY MR. RAPHAEL:

9    Q    All right.  Okay.  I'm just going to move on.

10           So with regard to the document that -- I'm sorry.

11           With regard to the document that defense counsel was

12   talking to you about, you produced those back in 2009, correct?

13   A    Correct.

14   Q    Okay.  And so when he said that you selected specific

15   portions of the complete magazine of In Touch for summer of

16   2005 but didn't -- you know, didn't provide the entire thing,

17   did opposing counsel ever ask you for the complete copies?

18   A    No.

19   Q    Okay.  So between 2009 and the present, you were never

20   asked by opposing counsel or anyone from his office for

21   complete copies of the editions of the In Touch magazine that

22   you provided us with selections of, correct?

23   A    Correct.

24   Q    Okay.  If he had asked you for those, you would have

25   produced them?

1          MR. BORCIA:  Objection; calls for speculation.

2          THE COURT:  Objection sustained.

3   BY MR. RAPHAEL:

4   Q    Did you have the complete copies to produce if you were

5   asked for them?

6   A    Only the magazines.  The electronic we don't still have

7   those.

8   Q    But the complete copy of the summer of 2005 In Touch

9   magazine you do have?

10  A    Yes.

11  Q    Same with the one for 2006?

12  A    We should have, yes.

13  Q    Okay.  And the one for 2008, as well?

14  A    We should have, yes.

15  Q    Okay.  Okay.  The other thing opposing counsel said was

16  that you don't make your membership read these magazines,

17  correct?

18  A    Correct.

19  Q    So there's no punishment if they don't read these

20  magazines?

21  A    Correct.

22  Q    You lead them to the magazines or send them to the

23  magazines, but you don't make them drink the magazines?

24          MR. BORCIA:  Objection; form.

25          THE WITNESS:  Figuratively.

1      THE COURT:  I'm going to overrule it.

2      THE WITNESS:  Figuratively speaking, correct.

3  BY MR. RAPHAEL:

4  Q   But these magazines are put together in the ordinary course

5  of your association's business to provide the membership with

6  important information, correct?

7  A   We put together information that we think will be helpful

8  in the running of their businesses.

9      MR. RAPHAEL:  Nothing further.

10      MR. BORCIA:  Just super briefly, Judge.

11      R E C R O S S - E X A M I N A T I O N

12  BY MR. BORCIA:

13  Q   Ma'am, I never asked you for any documents in this case,

14  correct?

15  A   I don't have a record of it.  I mean -- I don't know your

16  name, so.

17  Q   Jim Borcia.

18  A   Okay.

19  Q   No one from Sogro -- representing Sogro asked you for any

20  documents in this case?

21  A   I don't think so.

22  Q   You were subpoenaed by the plaintiff's counsel, correct?

23  A   Correct.

24  Q   And you sent the documents in response to the subpoena to

25  the person who subpoenaed you, correct?

1   A   Correct.

2   Q   And that was the plaintiff's counsel?

3   A   Correct.

4   Q   And when you sent the plaintiff's counsel the documents he

5   requested in his subpoena, he never asked you for the complete

6   copy of these magazines, did he?

7           MR. RAPHAEL:  Objection; relevance.

8           THE COURT:  Overruled.  It's the same subject you

9   addressed.

10          THE WITNESS:  I've got the document rider here that

11  specified the different information and articles that were

12  needed.

13  BY MR. BORCIA:

14  Q   Right.

15  A   And I believe that it's talking about documents relating to

16  and then specific topics.

17  Q   So you weren't asked to produce by the party who subpoenaed

18  you, the plaintiff's counsel, the entire magazines, were you?

19  A   It was not specified in that manner, no.

20  Q   And after you produced the documents to the plaintiff's

21  counsel that you produced, they never contacted you and said

22  your production is not complete; we need more information?

23  A   I do have an affidavit that was in 2011, but I don't think

24  I have anything -- I don't think there were any other requests.

25  Q   There was no request outside of the affidavit for you to

1    produce more documents?

2    A    Correct.

3    Q    And there was no request for you to produce the complete

4    documents from these excerpts that you've selected and gave to

5    plaintiff's counsel, correct?

6    A    Correct.

7             MR. BORCIA:  That's all I have.  Thank you.

8             THE COURT:  Does the jury have questions of the

9    witness?

10            (No response from the jurors.)

11            THE COURT:  Inasmuch as there are no more questions,

12   the Court is going to release the jury, and the witness may

13   step down.

14            Is there any reason for the witness to remain

15   available for any other testimony in this case?

16            MR. BORCIA:  No, Your Honor.

17            THE COURT:  All right.  You're excused.

18            Members of the jury, please keep in mind the

19   admonitions that I've given you during the course of this

20   trial.

21            You are not to look at any material, go to any places,

22   or express any thoughts to anyone electronically or otherwise

23   until you have completed your work as jurors and this case has

24   been decided.

25            We will resume tomorrow morning at 8:30 or soon

 1    thereafter as logistical arrangements will allow.  I add that

 2    because we may very well have some additional technical

 3    obstacles slash hurdles, snowstorms, et cetera to deal with.

 4            Have a good night.  Stay warm.  We'll see you

 5    tomorrow.

 6            THE BAILIFF:  All rise.

 7            THE COURT:  I will see you in the morning.

 8            (Proceedings concluded at 4:38 p.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF WISCONSIN  )
                        )  SS:
2    MILWAUKEE COUNTY   )

3

4

5                       I, SHERYL L. STAWSKI, a Registered

6    Professional Reporter and Official Court Reporter, for the

7    United States District Court, Eastern District of Wisconsin, do

8    hereby certify that the above proceedings were reported by me

9    on the 24th day of February, 2015, and reduced to writing under

10   my personal direction and is a true, correct and complete

11   transcription of my computer-aided transcription of my

12   stenographic notes.

13

14                       Dated at Milwaukee, Wisconsin, this 15th

15   day of April, 2015.

16

17                            s/ Sheryl L. Stawski

18                            Sheryl L. Stawski
                              Official Court Reporter
19                            United States District Court

20

21

22

23

24

25
```